## BURNETT SNYDER *v.* HOLY CROSS HOSPITAL ET AL.

[Misc. No. 36, September Term, 1975.]

*Per Curiam Order January 22, 1976.*

*Opinion filed February 26, 1976.*

318

The cause was argued before ORTH, C. J., and THOMPSON, GILBERT and MELVIN, JJ.

*Marcia K. Docter* for appellant.

*Paul Walter, Special Assistant Attorney General,* and *Francis B. Burch, Attorney General,* for State Department of Health and Mental Hygiene.

ORTH, C. J., delivered the opinion of the Court.

## STATEMENT OF THE CASE

On 20 January 1976 Burnett Snyder instituted an action in the Circuit Court for Montgomery County to prevent a post-mortem examination from being made on the body of his son, Neal.[1] The Bill of Complaint alleged that the son, eighteen years of age, died suddenly on 19 January 1976 at 12703 Layhill Road in Silver Spring, where he resided with his parents. The body was at Holy Cross Hospital, and a Deputy Medical Examiner of the State of Maryland, Dr. John Rogers, had directed that it be removed to Baltimore for a post-mortem examination. The father was "a practicing member of the Jewish Orthodox Faith, and . . . his

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, February 2, 1976.

1. Burnett Snyder v. Holy Cross Hospital, Dr. John Rogers and Dr. Russell S. Fisher, Equity No. 54674.

In the transcript of the proceedings below and sometimes in the pleadings, the name is spelled "Neil".

religious convictions prohibit any molestation of the body after death." He sought that the Hospital, Dr. Rogers, and Dr. Russell S. Fisher, the State Medical Examiner, "be enjoined temporarily and permanently from tampering with the body of Neil Snyder in any manner whatsoever, and that they further be enjoined from performing any and all post-mortem examinations." He prayed that they be directed to release the body immediately to a designated funeral home "for proper burial in accordance with the precepts of the Jewish Faith." A plenary hearing was held the same day, and on 21 January 1976 the court issued an order denying the prayer for an injunction but directing the defendants "to maintain the status quo and refrain from undertaking any steps to perform an autopsy upon the body of the decedent . . . until determination of the appeal noted this date." The appeal to this Court was noted on 21 January and on that date the father filed a Motion for Immediate Hearing and Other Relief. We ordered that a hearing be held on 22 January at 1:30 p.m., and that the filing of briefs be waived. A transcript of the proceedings below was received, and the hearing proceeded as ordered. Upon its conclusion, after due deliberation, we issued a Per Curiam Order:

> "For reasons to be stated in an opinion to be filed later, it is this 22nd day of January, 1976
>
> ORDERED, by the Court of Special Appeals that the judgment of the Circuit Court for Montgomery County of 21 January 1976 denying the injunctive relief prayed in the bill of complaint be, and it is hereby affirmed with costs; and it is further
>
> ORDERED, that the mandate be issued forthwith."

On 23 January the father petitioned the Court of Appeals for a writ of certiorari and moved that it stay our decree. The same date the Court of Appeals denied the motion to stay. It denied the petition for the issuance of a writ of certiorari on 2 February. We now give the reasons for our order of 22 January 1976 denying the relief sought.

320

### FACTS

The circumstances surrounding Neal's death on 19 January 1976 were elicited from his father at the hearing below. Mr. Snyder picked up his son at school about 1:00 p.m. and they went directly home. Neal was in the house with his father the rest of the afternoon. They were in "contact" with each other "[a]ll the time. We walked from room to room. He came into our room, and we would go into his room." Neal died about 6:00 p.m. "He was in our room. I really don't know, we were just talking and he started to go into his room. He walked out, I was kidding around with him, but he didn't answer. He walked into his room and we heard a thud. I went in and thought he was kidding around and said, 'Come on [Neal] get up'. He was dead. . . . We called the Rescue Squad. . . . He was taken to Holy Cross Hospital. He was already dead before they ever got there." [2] The father said that his son had no history of heart trouble. "The only time he was in the hospital was twice, when he was born and when he had his tonsils out. He was never sick a day in his life, other than a cold. . . . He was never sick." The father was asked if he had discussed the cause of his son's death with his pediatrician or family doctor. "The pediatrician said he spent 20 minutes going through his chart and could not find any reason. The family doctor never examined him. He would not know."

---

2. A report of the death which appeared on 23 January 1976 in the Metro Section of the Washington Post under the by-line of B. D. Colen, Washington Post Staff Writer, relates circumstances which were not brought out at the hearing below or before us. The newspaper article read:

About 6:30 p.m. Snyder and his parents were in his parents' bedroom at the family's home on Layhill Road. "We were kidding around and I was testing out a new electric heater. It gave off a stench and he said 'I'm going to get out of here,' " remembered Burnett Synder.

"He started to leave the room and slipped on the box the heater had been in and rolled onto the bed," said the elder Snyder, who added that his son did not hit his head or fall onto the floor.

As the young man got up off the bed he looked at his mother. According to his father, "The look in his eyes said, 'Help me.' I think he was already in God's hands as he left the room. He walked into his bedroom and I heard him hit the floor. When I got there he was dead."

The Hospital notified the Deputy Medical Examiner about 7:15 p.m. He testified: "I inquired as to circumstances surrounding the death, the information from the medic unit that brought the patient to the hospital, the history given to the doctors there, the history upon arrival from the doctor in charge of the emergency room, and I got the story from Officer Wheatman who talked to various members of the family for the first time." The result was that the doctor could not determine the cause of death. "I have no idea. . . . There is nothing that shows. The man was in good health. He just suddenly died." In such circumstances, "we do a post-mortem in Baltimore at the Medical Examiner's Office to try to determine the cause of death. It is my position, my job, to give a cause of death on death certificates. Without any knowledge of what caused it, I can't fill one out." He knew of no way "short of a complete post-mortem examination to determine the cause of death." "If a person is young [25 or lower] and dies in apparent health, I order one invariably. . . . It is unusual to die of a sudden death without any reason for it, unless a person has a long history of heart trouble, or things you might expect him to die from. Then we may not do one. If a person is in good health, we do one." [3] Neal Snyder's death was sudden and unexplained.

The police had started an investigation of the death. "They

---

3. Dr. Rogers explained when a post-mortem may not be ordered:

"Considerable years [of age] and a history of illness, for instance hypertension, heart disease, heart failure or the like, and they suddenly up and die in their sleep, without any other circumstances surrounding it, then after proper investigation with the police and so on we would not do one sometimes."

On cross-examination it was elicited that at one time Dr. Rogers was entertaining the possibility of waiving the post-mortem. "I had not agreed to it, I was in the process of possibly doing that after consultation with the State's Attorney, with the police department and with Dr. Fisher's office. . . . I had not made up my mind." If he had waived it, what would be written in the death certificate would have been "strictly a guess as to the cause of death." That guess would have been "Asphyxiation due to vomiting." At one point the doctor had indicated that he would waive the post-mortem on the "say-so" of the State's Attorney, but changed his mind when he learned that the death of a young person in the county within the past twenty-four hours had been apparently "drug-related", although he had no information which connected that death to the death of Neal Snyder.

went to the hospital and conferred with Dr. Rogers and the other emergency room people." An officer talked to the family. The "background on the death", however, had not been entirely checked out because of the press of other matters. Sergeant O. J. Lennon, of the Montgomery County Police Department, assigned to the homicide squad said:

> "Our primary concern is what happened around the time of death, the history of the individual, who his associates are, certainly his medical history, if there is any. As a result of these we try and compile what happened or what may have been the cause of death which we are not always successful in. Many times it is necessary to request that an autopsy of the individual be conducted to help establish what the cause of death may have been."

The police investigate all cases of sudden death. "When there is no outward sign of what the cause of death was, we do investigate." The investigation of Neal Snyder's death had not determined the cause of death. "My understanding as of now, there is no information which we have which indicates why the young man died." The investigation would continue.

The right of the State to conduct a post-mortem examination of Neal Snyder is challenged on religious grounds. The father said that he was an Orthodox Jew. The tenets of his religion do not permit post-mortem examinations. The testimony of Rabbi Herzel Kranz and Rabbi Moshe Silverman corroborated this and explained the prohibition.[4]

---

4. Rabbi Kranz of the Silver Spring Jewish Center and Silver Spring Day Institute, said:

> "In the Jewish Religion, as the live human is considered holy, so is the deceased. The body does not lose its sanctity. In regard to death, of course we have the broader perimeters of resurrection. Along with that we have regard to the resting of the soul.
>
> In Jewish Law, and it is a verse in the Old Testament, the greatest concentration of the soul is in the blood. The soul touches all parts of the living body, but its greatest concentration is in the blood. Therefore, under any and all circumstances, down even to the laws of kashruth, in which we eat kosher meat, we go to extremes to extract the blood even from the kosher meat in order

## THE LAW

A certificate of death shall be filled out and signed within twenty-four hours after death by the physician last in attendance upon the deceased except in such cases where the Medical Examiner [5] takes charge of the corpse, in which case the certificate shall be executed by him. Code, art. 43, § 20 (a). The Medical Examiner must take charge of the corpse when he is required to investigate the death. He is required to investigate the death of any person who dies (1) as a result of violence, or (2) by suicide, or (3) by casualty, or (4) suddenly when in apparent health or when unattended by a physician, or (5) in any suspicious or unusual manner. Code, art. 22, § 6.[6] The statute was implemented by "Regulations

---

not to tamper with the essence of live — whatever live creature it is.

In Jewish Law, except for a situation of saving a community or the act of saving another person's life, it is not permissible to tamper in any way with another person's body. If there is an epidemic, and this was so in the Middle Ages, where a Jewish court was convened to permit the tampering with the body, checking the body in order to help the living. But under any other circumstances that I know of there has not been any permission granted in basic Jewish law."

Rabbi Silverman of the "B'nai B'rith Hillel Foundation, University of Maryland", stated that "Judaism is very, very strong and very adamant in maintaining the purification and the wholeness and completeness of the body.... God himself views the sanctity of a body, in its completeness it should be returned to the ground.... God takes the soul away, but the body is to remain in perfect condition and treated with the utmost respect, more so than one's living body."

5. The General Assembly created the Department of Post-Mortem Examiners, headed by a Commission, as part of the Department of Health and Mental Hygiene. Code, art. 22, § 1. The Commission is authorized to appoint six medical examiners, one to be known as the chief medical examiner, § 2, and a deputy medical examiner for each county in the State, § 3.

6. Code, art. 22, § 6, reads, in pertinent part:

"When any person shall die in Baltimore City, or in any county of the State, as a result of violence, or by suicide, or by casualty, or suddenly when in apparent health or when unattended by a physician, or in any suspicious or unusual manner, it shall be the duty of the police or sheriff immediately to notify the chief medical examiner and assistant medical examiner, or a deputy medical examiner, as the case may be, and the State's attorney of Baltimore City, or of the county, as the case may be, of the known facts concerning the time, place, manner and circumstances of such death. Immediately upon receipt of such notification, the said medical examiner shall go to the dead body and take charge of the

of the Maryland State Board of Post Mortem Examiners Governing Medical Examiner Cases" (P-M Rules).[7] "Medical Examiner case" is defined as "any death which is the result wholly, or in part, of a casualty or accident, homicide, poisoning, suicide, criminal abortion, rape, therapeutic misadventure, drowning, or a death of a suspicious nature, or of an apparently healthy person." P-M Rule 10.33.01.01. Subsection B of 10.33.01.01 provides: "A case which is dead on arrival at the hospital, however, shall be considered a Medical Examiner case unless the physician who pronounces death has been in previous attendance on the patient." Each hospital shall appoint an agent "with whom the Medical Examiner can at any hour communicate regarding Medical Examiner cases in such hospital. . . ." 10.33.01.05 A (1). The agent shall submit promptly certain information as to each Medical Examiner case to the Medical Examiner" in order to allow him to decide the disposition of each such case." 10.33.01.05 B (3). And see Code, art. 43, § 23. The Deputy Medical Examiner in a county may release to the hospital four types of Medical Examiner cases as set out in 10.33.01.03 A.[8] As to cases so released, the hospital agent shall complete the death certificate, but it must be countersigned by the Medical Examiner. A sudden death case may be released to the hospital only when associated with a therapeutic procedure. 10.33.01.03 B and A (3).

---

same. Such medical examiner shall fully investigate the essential facts concerning the medical causes of death and may take the names and addresses of as many witnesses thereto as may be practicable to obtain, and, before leaving the premises shall reduce such facts, as he may deem necessary to writing and file the same in his office."

7. Code, art. 22, § 4, authorizes the Commission to adopt and promulgate rules it deems necessary to make effective the Post-Mortem Examiners article.

8. The four types are:

(1) Death from acute or chronic alcoholism without manifestation of trauma.

(2) Death from accidental burns occurring in the home.

(3) Death, or sudden death, associated with a therapeutic procedure.

(4) Death following a fracture in an elderly person and resulting from a simple fall in the home.

In those cases in which the Medical Examiner takes charge of the body, if the cause of death is established beyond a reasonable doubt, he may simply so report. "If, however, in the opinion of such medical examiner, an autopsy is necessary, the same shall be performed. . . ." Code, art. 22, § 7.[9] The section makes it "the duty of any deputy medical examiner to call upon the chief medical examiner or an assistant medical examiner, or other person authorized and designated by the chief medical examiner, to make an examination or perform an autopsy whenever he deems it necessary or desirable, and it shall be the duty of said chief medical examiner or assistant medical examiner to perform such examination, except in such cases as a competent pathologist is so authorized by the chief medical examiner to perform such autopsy."

## DECISION

It is clear that the Medical Examiner was obligated by law to take charge of the body of Neal Snyder. The young man was dead on arrival at the Hospital, and there was no physician who had been in previous attendance. He died suddenly when in apparent good health. It was a "Medical Examiner case", and the Medical Examiner had to investigate the death to determine its cause.

It is equally clear from the evidence adduced, that, on the investigation conducted, the cause of Neal Snyder's death was not established beyond a reasonable doubt. It appeared that the cause of death could only be so established by ascertaining the medical reasons for it, and that an autopsy was required to determine the medical reasons. The responsibility imposed by law was manifest. An autopsy had to be performed, and a medical examiner had to perform it.

---

**9.** Section 7 prescribes: "A detailed description of the findings written during the progress of such autopsy, and the conclusions drawn therefrom, shall thereupon be filed in the office of the chief medical examiner, or in the office of the deputy medical examiner in the county where the death occurred. A copy of the findings and conclusions as to the autopsies performed in the several counties shall also be filed in the office of the chief medical examiner."

Acts 1974, ch. 338, effective 1 July 1974, reenacted § 7 without making change in the provisions as enacted by Acts 1955, ch. 29.

Father claims, however, that even if the law requires that an autopsy be performed, the law is unconstitutional. He does not contend that the law is unconstitutional on its face, but he urges that it is unconstitutional as applied to him. He put it this way in his petition for writ of certiorari: "The substantial constitutional issue is . . . whether the interest of the State in directing a post-mortem examination on the body of Neal Snyder, deceased, is a sufficiently compelling reason to overrule the religious objections of [Burnett Snyder]."

The challenge to the law is bottomed on constitutional rights commonly referred to as "freedom of religion." The first amendment to the Constitution of the United States, applicable to the States through the fourteenth amendment, *Cantwell v. Connecticut*, 310 U. S. 296, 303 (1940); *Hopkins v. State*, 193 Md. 489, 496 (1949), provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . ." Article 36 of the Declaration of Rights of the Constitution of Maryland, declares, in pertinent part: "[A]ll persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; . . . ." Those clauses are unexceptionable under the first and fourteenth amendments. *Levitsky v. Levitsky*, 231 Md. 388, 397 (1963).

The federal and State free exercise clauses give extensive protection of religious liberty. *McMillan v. State*, 258 Md. 147, 151 (1970). "But the First Amendment embraces two concepts, freedom to believe and freedom to act. On one hand, it prevents compulsion by law of the acceptance of any creed or the practice of any form of worship. On the other hand, it safeguards the free exercise of the chosen form of religion. Freedom to believe is absolute, but freedom to act is not. Conduct is subject to regulation for the protection of society. While the power to regulate must be so exercised in

every case as not to infringe the protected freedom, the State, by general and nondiscriminatory legislation, may safeguard the peace, good order and comfort of the community without unconstitutionally invading the liberties protected by the Fourteenth Amendment." *Hopkins v. State, supra,* at 496. And Article 36 of the Declaration of Rights, as we have set out, contains the express proviso that a person may not, under the color of religion, disturb the good order, peace or safety of the State, infringe the laws of morality, or injure others in their natural, civil or religious rights. So, as the Court said in *Craig v. State,* 220 Md. 590, 599 (1959): "While a person's freedom to *believe* is absolute, his freedom to *act* is not. His *conduct* is subject to regulation for the protection of society, and, while the power to regulate must be so exercised in every case as not to infringe the protected freedom, the State, by general and nondiscriminatory legislation, may safeguard the peace, health and good order of the community without constitutionally invading the liberties guaranteed by the Fourteenth Amendment." [10] See *Levitsky v. Levitsky, supra,* at 396. "Accordingly, the State may abridge the religious practices of any individual only upon a demonstration that some compelling state interest outweighs the interest of the individual in his religious tenets." *McMillan v. State, supra,* at 152. The ultimate question is whether such a compelling state interest was demonstrated here.

It is the religious practices of the father which are alleged to be abridged by the performance of an autopsy on the body of his son.[11] The preliminary inquiry is whether the father

---

**10.** Chief Justice Waite put it thus in Reynolds v. United States, 98 U. S. 145, 166 (1878): "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions they may with practices." Mr. Justice Roberts tersely stated in Cantwell v. Connecticut, *supra,* at 303: "[T]he [first] Amendment embraces two concepts — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

**11.** The evidence established, and appellees concede, that the tenets of the religion of the father prohibited the performance of an autopsy in the circumstances. The record does not show that Neal Snyder embraced the Orthodox Jewish Faith. We postulate that he did. His older brother, Joseph Moshe Snyder, "preparing for the rabbi in that faith", was a student at the "Rabbinical College of America in New Jersey", characterized as "an

may assert his own constitutional rights relating to freedom of religion with regard to an autopsy to be performed on the body of his son.

In this country it is "universally held that those who are entitled to the possession and custody of [a dead body] for purpose of decent burial have certain legal rights to and in it which the law recognized and will protect. Indeed, the mere fact that a person has exclusive rights over a body for the purposes of burial leads necessarily to the conclusion that it is his property in the broadest and most general sense of that term, *viz.*, something over which the law accords him exclusive control." P. E. Jackson, *The Law of Cadavers and of Burial and Burial Places* (2nd ed. 1950) 132.[12] The right is to the possession of the corpse. The invasion or violation of the right furnishes a ground for a civil action for damages.[13] "Likewise the right to possession of a dead body for purposes of burial has been described as a 'quasi-property' right in the nature of a 'sacred trust' that a court will uphold as a result of natural sentiment, affection, and reverence. 'It would be

---

Orthodox Jewish College". Whether any constitutional rights Neal Snyder may have had survived him, and if they did, whether they may be asserted by someone else, is not before us.

12. This is not to say that a dead body is property in the ordinary commercial sense or that it has value as an article of traffic. The courts in the United States have refused to treat a dead body in a material sense. "[I]t is not part of the assets of the estate (though its disposition may be affected by the provision of the will); it is not subject to replevin; it is not property in a sense that will support discovery proceedings; it may not be held as security for funeral costs; it cannot be withheld by an express company, or returned to the sender, where shipped under a contract calling for cash on delivery; it may not be the subject of a gift *causa mortis*; it is not common law larceny to steal a corpse. Rights in a dead body exist ordinarily only for purposes of burial and, except with statutory authorization, for no other purpose." Jackson, at 130. (footnotes omitted)

13. See, for example, Palenzke v. Bruning, 98 Ill. App. 644 (1901); Patrick v. Employers Mut. Liab. Ins. Co., 118 S.W.2d 116 (Missouri App. 1938); Brown v. Broome Co., 197 N.Y.S.2d 679 (A.D. 1960); Streipe v. Liberty Mut. Ins. Co., 47 S.W.2d 1004 (Ky. App. 1932) in which damages were allowed when coroners failed to comply with statutes giving statutory permission for autopsies.

See also Young v. The College of Physicians and Surgeons, et al., 81 Md. 358 (1895) where it was held that a coroner who had authority to order an autopsy to be made and a physican who performed the autopsy on the order of the coroner were not liable to the wife of the deceased when there was no evidence that in directing the autopsy to be made the coroner acted maliciously or corruptly.

more accurate to say that the law recognizes property in a corpse but property subject to a trust and limited in its rights to such exercise as shall be in conformity with the duty out of which the rights arise'." *op. cit.* at 133. Jackson continues, at 133-134: "Thus our courts have evolved the necessary juridical basis for conferment of jurisdiction, i.e. a qualified property right, one of custody, control, and disposition of a *res* that itself is not material property. This denomination of a qualified property right is a happy one from the standpoint of sustaining the equitable right to grant temporary relief by injunction, . . . ."

The rule set out by Jackson is the law of this State. It was said in *Painter v. U. S. Fid. & Guar. Co.,* 123 Md. 301, 308 (1914):

> "The Courts hold that the surviving husband or wife or next of kin have a *quasi* property right in the body in the absence of testamentary disposition. The right is not a property right in the general meaning of property right, but is extended for the purpose of determining who shall have the custody of the body in preparing it for burial. And Courts of Equity will protect those having this right from unreasonable disturbance."

See *Unterstitzung Verein v. Posner,* 176 Md. 332 (1939) in which the Court said, at 334: "It has generally and long been recognized that equity only affords an adequate remedy in cases involving the disposition of bodies of the dead," and in which, at 337, the Court iterated, in part, the quote from *Painter.* We conclude that the father had such a justiciable right in his son's body as would permit him to seek equitable relief from untoward interference with the father's possession and custody of that body for the purpose of decent burial.[14]

---

14. The Court observed in Young v. The College of Physicians and Surgeons et al., *supra,* at 366:

"It is to be hoped that few persons in a civilized country would wantonly mutilate a dead body, or would without warrant of law attempt to prevent surviving friends and relatives from per-

We assume for the purpose of decision in this case only, that the judicial relief father sought could be properly predicated upon the free exercise clauses of the constitutions as applicable to him.[15] We find that the religious practices of the father were properly abridged by the State in the application of the statutes concerning post-mortem examinations because there were compelling state interests which outweigh the interest of the father in his religious tenets.

It is patent that the State has a compelling interest to safeguard the peace, health and good order of the community. To this end it needs to know when a death results from a criminal act or when the cause of death is such that the health and well-being of others may be adversely affected. That it may obtain this knowledge is the purpose and the underlying basis of the statutes pertaining to post-mortem examinations. These statutes and the rules implementing them are general and non-discriminatory. They are a valid exercise of sovereign power. When they are properly applied, as they were here, their purpose may not be defeated by invoking the constitutional guarantees of free exercise of religion with respect to the practice of religion. Practice in pursuit of the exercise of religion is not entirely

---

forming the rites of Christian sepulture. Such acts would manifest a great depth of depravity."

We note that in Painter v. U. S. Fid. & Guar. Co., *supra*, the Court held, in the face of a constitutional challenge based on deprivation of property without due process, that a contract right of an insurance company as the insurer in an accidental death policy to make an autopsy in case of death was superior to any property right as to the body of the insured in any member of the family of the insured. 123 Md., at 309.

15. We point out, however, that in Matter of Quinlan, 137 N. J. Super. 227, 348 A. 2d 801, decided 10 November 1975 by the Superior Court of New Jersey, Chancery Division, now on appeal before the Supreme Court of New Jersey, the court said, 348 A. 2d at 823:

"The temporal world is what the Free Exercise Clause deals with — not the hereafter. All instances where a religious belief has been freed of attempted governmental interference dealt with *life* styles and *life* circumstances. . . . In those instances where the parental standing to assert the religious belief has been upheld, it dealt with future life conduct of their children, not the ending of life. *Wisconsin v. Yoder*, 406 U. S. 205, 92 S. Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters*, 268 U. S. 510, 45 S. Ct. 571, 69 L.Ed.2d 1070 (1925)."

free from government regulation. Here, the evidence was legally sufficient to establish that the cause of Neal Snyder's death could not be determined without an autopsy, and the interest of the State in ascertaining the true cause by an autopsy outweighed the interest of the father in his religious tenets.[16] Thus, the chancellor was correct in refusing to enjoin the performance of the autopsy.

The father referred to three cases in support of his position, *Sherbert v. Verner,* 374 U. S. 398 (1963), *Wilensky v. Greco,* 344 N.Y.S.2d 77 (S. Ct. N. Y. 1973), and *People v. Miller,* 368 N.Y.S.2d 788 (S. Ct. N. Y. 1975). They do not persuade us from our view.

*Sherbert* is in accord with the law as we have found it to be. It concerned a denial of workmen's compensation benefits by a state because of the claimant's faith. 374 U. S. at 410. The Court said that although "[t]he door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, . . . the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions [it] is not totally free from legislative restrictions' . . . . The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." 374 U. S. at 402-403. The conduct here posed such threat.

*Wilensky* is comparable to the case *sub judice* only in that a coroner wanted to conduct an autopsy on the body of the son of Orthodox Jews who resisted the proposed action as repugnant to their religious beliefs. County law permitted an autopsy when "necessary." The son had died from multiple serious injuries sustained in an automobile accident with no evidence of criminality or foul play. That the death was caused by the injuries was evident but the coroner wanted to know which of the injuries was the immediate

---

**16.** This balancing process has long been recognized and applied by the Supreme Court. As the balance goes so goes the decision. See Wisconsin v. Yoder, *supra,* Cantwell v. Connecticut, *supra,* and Reynolds v. United States, *supra.*

cause. Obviously there was no compelling need for the State to determine precisely which one of the multiple serious injuries was the cause of death, and the court found, properly we think, that the autopsy was not "necessary" in the contemplation of the law.

In *Miller* the District Attorney sought an order permitting him to exhume the body of a decedent who died in an automobile accident which gave rise to a charge of vehicular homicide against Miller. The widow of the decedent opposed the application. The District Attorney conceded that there was enough evidence available to obtain an indictment but that the evidence should be buttressed by a medical opinion as to the cause of death obtained by an autopsy. A statute gave any district attorney the right to obtain an order to exhume whenever he shall deem it necessary. The court held that there must be a reasonable basis for the district attorney's conclusion that an exhumation was necessary and that in the case before it he had not adequately explained why the hospital records and the testimony by those physicians who attended the deceased from the time of the accident to the time of his death were not adequate to supply such proof as may be necessary as to the cause of death. *Miller* is clearly factually inapposite to the case before us.

## SUMMARY

1) Under the constitutional guarantees respecting religion, the freedom to believe is absolute, but the freedom to act is not:

 a) acts in pursuit of the exercise of a religious belief may be regulated by the State to safeguard the peace, health, and good order of the community.

2) In the circumstances of Neal Snyder's death:

 a) the laws of Maryland require that

 i) the Medical Examiner take charge of the body and investigate the death;

> > > ii) upon investigation, if the Medical Examiner is unable to determine the cause of death beyond a reasonable doubt, he shall perform an autopsy.
>
> > b) there was a compelling State need to ascertain the cause of death to safeguard the peace, health, and good order of the community.
> > c) the cause of death could be determined beyond a reasonable doubt only through an autopsy.

> 3) Therefore, it is our independent constitutional appraisal that the conduct of the autopsy on the body of Neal Snyder would not be repugnant to the free exercise of religion guaranteed by the federal and State constitutions.

It was for those reasons that we affirmed the judgment of the Circuit Court for Montgomery County denying the injunctive relief sought by Burnett Snyder.