WICKER, Judge.
This action arises from a proceeding wherein the petitioner, Lionel P. Dufour, seeks authority from the court in order to collect soil samples for the purpose of determining the length of time his mother’s copper casket was in the tomb and the extent of deterioration of the casket.[1] After a contradictory hearing the trial judge ordered inter alia[2] the removal of the tomb cover along with the removal or rearranging of caskets and/or body bags in order to permit the soil sampling. West-lawn Cemeteries, Inc. was ordered to coop *1182 erate with the ordered removal and rearrangement of the remains. Westlawn has appealed that judgment; Lionel P. Dufour and Martin P. Dufour have answered the appeal. Martin P. Dufour was made a party prior to judgment. Westlawn argues the petitioners failed to meet their burden of proving that such removal was a necessity or for a laudable purpose. Lionel P. Dufour and Martin P. Dufour argue the trial judge should have allowed them as well as their soil analyst to be present during the exhumation and reinternment and to allow them to take photographs. We reverse and also deny the answer to the appeal.
Lionel Dufour was asked at the hearing the purpose for taking soil samples. He testified as follows:
Q. Okay. Mr. Dufour, I understand that the reason why you want to do this testing is, one, to determine whether or not the casket was even in place, is that correct?
A. Yes, sir, that’s one reason.
* * * * * *
Q. What other reasons, if any, do you have for wanting to remove the caskets and the body and take samples?
A. I would like to find out if it was there or not. Twelve years ago, if it was sitting there for twelve years. If it has not been sitting there for twelve years, then somebody stole it. If it has been sitting there twelve years, and it’s decomposed, she should have notified me about that. She should have told me about that, prior to that. I would not have hesitated to spend money to buy another casket or buy another tomb. I noticed one time when I went by there after, there are tombs in the ground that have ledges to put, I guess, to put pieces of metal to where you can stack the casket over another one without them actually touching. I would not have hesitated to buy that than to put my mother in a body bag. I would have left it as it was, and I would have got something different for my brother.
* * * * * *
Q. Do you also intend to make a claim against the tomb manufacturer, being the coffin manufacturer, if it was in fact deteriorated like you say?
A. Yes.
Lionel Dufour’s reasons then are: (1) to obtain evidence as to whether the coffin was in place for 12 years, and (2) if found to have been in place for 12 years whether the coffin deteriorated so as to necessitate his mother’s being placed in a body bag.
Lionel P. Dufour further testified as follows. He stated he and his brother Martin F. Dufour are the only surviving descendants of their mother, Frances D. Dufour, and their father, Rosemond John Dufour. Their mother was buried approximately 12½ years ago on the left side of a crypt at Jefferson Memorial Gardens.[3] On the right side of the crypt their father was buried. There is a wall separating the two sides. In February, 1992 their brother, Roland J. Dufour, died. He had no children.
Lionel P. Dufour stated he requested that his brother be buried in the same crypt, on the mother’s side. He stated no mention was made about pulling the mother’s casket out, placing her in a body bag, and destroying the casket. Instead, after the funeral services were over the cemetery authority asked him to sign authorization. He admitted signing the document which was introduced into evidence. It was dated February 1, 1992. It authorizes the opening of the grave site and states:
If prior entombments have been made and if necessary to accommodate the present burial, cemetery is authorized to rearrange, remove and or destroy previous caskets, whether said caskets are made of wood, metal or other materials.
When his brother was buried he noticed a cloth-like material over the top. He was not “brave enough” at the time to examine *1183 the grave carefully. However, certain cousins did look carefully and later told him they saw his mother lying at the bottom “in about two inches of water in a body bag.” At the time he signed the authorization no one had informed him his mother had been placed in a body bag and her casket destroyed.
After he learned the information from his cousins he called Ms. Novak, approximately two months after the funeral. She told him the mother’s casket was deteriorated and falling apart. Ms. Novak told him if the casket were metal it would have been smashed and disposed of in a dumpster. He called a dispatcher at B.F.I. and was told no casket had been picked up at this cemetery.
John Paul Jendrzejewski, an expert in metallurgy and failure analysis, testified as follows. He explained the procedures he would have to undertake in order to take soil samples to determine whether the mother’s copper casket had deteriorated. He would expect copper to deteriorate after being in the earth for 12 years. He stated that if the copper casket had “virtually failed or lost its integrity, there should be a fair amount of corrosion product.” He explained:
the relative amount and types of particles should give one an idea of how extensive the degradation of a particular casket would have been, in other words, to render it loss of structural component. This should be a substantial amount of metal or metal corrosion products, as opposed to just a minimal or just background amount, in which case it would indicate that there might be something else going on, not necessarily deterioration or degradation of the casket.
In order to perform his analysis he needed access to the bottom of the crypt. He would take samples at four to six locations. He would visually inspect the area to determine location for sampling. Additionally, he would document the process by photographs.
On cross examination he stated he did not know there were two copper coffins in this grave. He was asked:
... Is there anyway that you would be able to distinguish between where the copper component in the soil came from, whether it was one coffin or the other coffin, if there are two actually located in this particular burial place? Q.
A. It would, if the copper composition, of the casket compositions are similar, that would be difficult.
Thus, Jendrzejewski’s soil sampling may lead to inconclusive results dependent upon whether or not the casket compositions were similar. Additionally, Jendrzejewski stated he assumed the casket was made of other components besides metal and that as far as any other type of deterioration, his testing would show results dependent upon the type of deterioration which occurred. He admitted he had no experience in handling coffins other than as a pallbearer. His expertise in determining the deterioration of a coffin is therefore limited to determining the deterioration of copper. His test findings are further made difficult if the mother’s and father’s coffins are of similar copper composition.
Faucheaux testified as follows: It has been the custom of Southeast Louisiana cemeteries for “well over a hundred years” to make a third and fourth placement in a situation where there are two casket placements. This “requires two things, deterioration of the remains of the prior burial and secondly, removal of the casket previously used for the one that you are rearranging.” He stated the condition of the casket has nothing to do with the decision to remove it. His cemetery discards the casket and places it in a dumpster maintained by B.F.I.
Faucheaux testified that in order to take the soil samples both the deceased bodies of the mother and the brother would have to be removed. He stated there would be health, fluid, odor, and sanitation problems in disturbing the brother’s newly interred remains.
He explained there were two coffins in the coping, one of which was the copper casket of Rosemond John Dufour buried there January 3, 1987. The mother is in a *1184 polyurethane wrapping. He testified that the copper casket containing the remains of the father are on the one side and the brother’s casket along with the remains of the mother are on the other side. The father’s casket would not have to be disturbed in order to collect the soil samples.
Michael D. Boudreaux, Director of Cemeteries for the New Orleans Archdiocese, testified as follows. He stated there has been a tradition to reuse cemetery space. In the instant case if the casket had not been removed there would not have been enough space. Thus it would not matter whether the coffin was deteriorated or not. It is his policy that metal caskets which are removed are disposed of.
We note at the outset that the enabling statute, pertinent herein, which authorizes the removal of remains from a cemetery space is La.R.S. 8:659.[4] In contrast, the unauthorized opening of a place of interment can in certain circumstances result in the criminal offense of desecration of graves. La.R.S. 14:101.
Act No. 417, of 1974, Section 1[5] stated the purpose of the provisions contained in La.R.S. 8:1 through La.R.S. 8:903 in pertinent part as:
relative to cemeteries and their regulation ... to establish guidelines and provide for rules and regulations dealing with ... human remains ... and otherwise generally and specifically to provide with respect to cemeteries, the disposition of human remains and like matters.
When La.R.S. 8:655, 8:659 and 8:660 were amended and reenacted in 1990 by Act No. 939, Section 1, the purpose was stated as follows:
To amend and reenact R.S. 8:655, 659 and 660, relative to the remains of a deceased person; to provide with respect to the right to control disposition and removal of the remains of a deceased person; and to provide for related matters.
La.R.S. 8:659[6] and 8:660[7] address the “removal of the remains of a deceased person” from a cemetery space.
La.R.S. 8:659 requires the consent of the cemetery authority. Since Westlawn did not voluntarily give its consent to removal of the remains, a judgment from the trial court was required. La.R.S. 8:659(B); Spiess v. Greenwood Development Co., Inc., 542 So.2d 810 (La.App. 3rd Cir.1989).
La.R.S. 8:1 does not define disinterment or removal of remains. Comment e following Section 868 of the Restatement (Second) of Torts indicates that removal includes disinterment. RESTATEMENT (SECOND) OF TORTS Section 868 (1979).
This action seeks to disinter the mother’s remains a second time. The purpose of the first disinterment, done with the consent of *1185 the cemetery authority, was to place the newly deceased brother’s remains in the crypt. This court is asked to determine whether the trial court correctly ordered a second disinterment of the mother’s remains, and a first disinterment of the brother’s remains for the purpose of collecting soil samples.
In Spiess, supra a mother petitioned the court three years after her son was buried to have her deceased son’s remains disinterred and removed from Alexandria, Louisiana to New Orleans, Louisiana, where she resided. She sought to have her son’s remains buried in the cemetery in which her son’s father was buried. She stated she was unable to visit her son’s grave because of “advanced age and ill health;” however, she did not object to the choice of the Alexandria site at the time of burial. Id. at 812. She filed suit after the Alexandria cemetery authority refused to transfer the remains. The trial judge in Spiess could find no reason to disturb the remains and dismissed her suit. She appealed and the Third Circuit affirmed. The Spiess court explained at 813:
When the defendant refused to voluntarily give its consent to exhumation and removal of the decedent’s remains, the sole authority to order the disinterment and transfer of the decedent’s remains becomes vested by law in the trial court.
A trial court’s decision regarding the disinterment of a deceased person requires the exercise of discretion and will not be reversed on appeal in the absence of a showing that this discretion was abused. In determining whether an abuse of discretion has occurred, we must recognize that exhumation of a body is not favored in the law and is against public policy, except in cases of necessity or for laudable purposes. 25 CJS Dead Bodies Section 4(1) (1966); Travelers Ins. Co. v. Welch, 82 F.2d 799 (5th Cir.1936); Choppin v. LaBranche, 48 La.Ann. 1217, 20 So. 681 (1896); Nolan v. Nolan, 125 So.2d 792 (La.App. 4th Cir.1961).
Another factor that must be considered is whether the party asserting the right to disinterment freely consented to the initial interment and with the understanding that the interment place selected was to be permanent. Bunol v. Bunol, 12 La.App. 675, 127 So. 70 (La.App. Orl.Cir.1930); Bradley v. Burgis, 25 So.2d 753 (La.App.Orl.Cir.1946); Nolan v. Nolan, supra.
In Spiess the petitioner admitted she was 72 years old and had difficulty even visiting her husband’s local grave. She also gave her consent initially to the Alexandria location. The appellate court found no abuse of the trial court’s discretion in denying disinterment and transfer of the remains.
In the instant case the petitioners do not seek to remove the remains of the decedents from one cemetery space to another but seek instead to open the crypt, and remove the decedents so as to gain access to the soil for the purpose of collecting soil samples. Had petitioners sought to remove the decedent or decedents to another cemetery space then the burden of proof set forth in Spiess would apply. In order to remove the remains of a decedent from one cemetery space to another there must be no abuse of the trial judge’s discretion in finding such removal was necessary or for a laudable purpose. Spiess, supra.
Here, although there is a request to remove the remains of the decedents from the cemetery space they are to be rein-terred in the same space after the soil sampling.
This court must therefore address the issue of the proper standard of proof when family members seek to remove remains in order to collect evidence. This issue is res nova in Louisiana. We note that the instant case is distinguishable from cases wherein the purpose for disinterment was to conduct an autopsy or examination of the remains. No autopsy or examination of the remains is requested herein. See LaBiche v. Certain Insurance Companies or Underwriters at Lloyd’s, London, England, 196 F.Supp. 102 (E.D.La.1961) and Travelers Ins. Co. v. Welch, 82 F.2d 799 (5th Cir.1936) wherein *1186 family members opposed disinterment for the purpose of examination and autopsy, respectively. See also, Matter of Band, 117 A.D.2d 597, 498 N.Y.S.2d 67 (A.D. 2 Dept.1986) in which a family member sought disinterment for the purpose of having a second autopsy, five years after death. In Matter of Band, disinterment was refused. It could not “be stated with any degree of certainty that a second autopsy performed more than five years after death and after a jury trial” would yield more conclusive or different results from the first. Id., 498 N.Y.S.2d at 68. In discussing disinterment the Matter of Band court explained at 68:
“Good and substantial reasons” must be shown before a court will sanction disinterment (Matter of Currier [Woodlawn Cemetery], 300 N.Y. 162, 164, 90 N.E.2d 18). A court, in exercising a “benevolent discretion,” must consider all the facts and circumstances peculiar to each case (Matter of Currier [Woodlawn Cemetery], supra, at p. 164, 90 N.E.2d 18).
By statute, La.R.S. 8:659, we have recognized that disinterment or removal of the remains of a decedent is subject to the control of the court. The reasoning for having custody of the body in control of the court is best understood by considering Justice Cardozo’s views in Yome v. Gorman, 242 N.Y. 395, 403, 152 N.E. 126, 129 (1926):
The dead are to rest where they have laid unless reason of substance is brought forward for disturbing their repose.
Likewise, our Supreme Court has regarded interment as a final resting place when interment has been by consent of “those most nearly interested”. Bunol v. Bunol, 12 La.App. 675, 127 So. 70, 72 (1930).
As explained in Dougherty v. Mercantile-Safe Deposit & Trust, 282 Md. 617, 387 A.2d 244, 246 n. 2 (Md.Ct.App.1978):
It is universally recognized that there is no property in a dead body in a commercial or material sense. “[I]t is not part of the assets of the estate (though its disposition may be affected by the provision of the will); it is not subject to replevin; it is not property in a sense that will support discovery proceedings; it may not be held as security for funeral costs; it cannot be withheld by an express company, or returned to the sender, where shipped under a contract calling for cash on delivery; it may not be the subject of a gift causa mortis; it is not common law larceny to steal a corpse. Rights in a dead body exist ordinarily only for purposes of burial and, except with statutory authorization, for no other purpose.” Snyder v. Holy Cross Hosp., 30 Md.App. 317 at 328 n. 12, 352 A.2d 334 at 340, quoting P.E. Jackson, The Law of Cadavers and of Burial and Burial Places. (2nd ed. 1950).
As explained in Corpus Juris Secundum (25 D.J.S. Dead Bodies Section 4(1) (1966) at 495:
Disinterment of a dead body is not a matter of right, and generally will not be ordered or permitted unless shown to be necessary and in the interests of justice; but there is no universal rule, and each case depends on its own facts. Where statutes concerning disinterment exist, they are controlling, [footnotes and citations omitted].
Thus, the Corpus Juris Secundum refers to the standard of proof as being “necessary and in the interests of justice” while noting there is no universal rule.
We are guided by a case from New York in which family members sought disinterment for evidentiary purposes other than autopsy.
In Crispo v. St. Mary’s Cemetery Ass’n, Inc., 258 App.Div. 1020, 17 N.Y.S.2d 70 (Sup.Ct.1940) the plaintiff sought an order to open and inspect five graves of his family contending that the cemetery had scattered the remains of one of his children. In that case the motion for opening and inspecting the graves was part of an action to recover for damages for the cemetery’s wrongful actions. The court reversed the order allowing the opening of the graves. It based its decision on the following 17 N.Y.S.2d at 70:
*1187 In the complaint there is a positive allegation that defendant perpetuated the alleged wrongful act, and hence it is unnecessary to open the graves in order for plaintiff to establish a prima facie cause of action.
Thus, the Crispo court considered whether the opening of the graves for inspection was necessary.
We therefore consider whether the trial judge abused his discretion in finding the disinterment was necessary. We also carefully weigh the policy that interment is regarded as a final resting place. Bunol, supra. Disinterment in this case necessarily rests upon the necessity of the soil sampling.
SOIL SAMPLING/NECESSITY FOR POLYURETHANE WRAPPING:
The testimony clearly establishes it is Westlawn’s policy to destroy coffins, whether deteriorated or not, in order to make room for an additional placement in the crypt. The condition of the mother’s coffin then had no bearing on Westlawn’s decision to place her in a polyurethane wrapping. A second disinterment of the mother’s remains for the purpose of soil sampling would be unnecessary for determining whether the coffin deteriorated to the extent it was necessary to place the mother’s remains in the wrapping.
SOIL SAMPLING/NECESSITY FOR DETERMINING WHETHER COFFIN WAS IN PLACE FOR 12 YEARS:
Lionel P. Dufour’s expert admitted that if the copper composition were similar for the mother’s and father’s caskets it would be difficult to determine whether the mother’s casket had been deteriorating for 12 years. Additionally, he could make no determination regarding the deterioration of other components of the casket.
We conclude there has not been a sufficient showing of necessity for disinterment of the mother’s remains a second time or for the first disinterment of the brother’s remains. Lionel P. Dufour had notice of the first disinterment since he, himself, requested it. He therefore had the opportunity at that time to be present to determine the condition of the casket. Additionally, the trial judge gave him the opportunity to depose Westlawn’s employees regarding the disinterment.
Accordingly, for the reasons stated, the judgment rendered November 16, 1992 is reversed and the petition dismissed. The answer to the appeal is denied. This court now renders judgment as follows:
DECREE
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the petition filed on behalf of Lionel P. Dufour and Martin F. Dufour seeking disinterment of the remains of Frances D. Dufour and Roland John Dufour for the purpose of collecting soil samples be and is hereby dismissed with prejudice.
REVERSED AND RENDERED.

. Westlawn Cemeteries, Inc. is the cemetery authority. La.R.S. 8:1(9) defines "cemetery authority” as follows:
"Cemetery authority” means any person, firm, corporation, trustee, partnership, association or municipality owning, operating, controlling or managing a cemetery or holding lands within this state for interment purposes.
In its reply brief Westlawn, the cemetery authority, states that there is a lawsuit pending in the 29th Judicial District Court in the Parish of St. Charles on behalf of “the petitioner” against Westlawn and four of its employees alleging the desecration of the remains of the mother and brother.

. The judgment rendered November 16, 1992 also ordered that Orleans Casket Company, Inc., Schoen’s Funeral Home, Inc. and Martin F. Def-our be made parties. They were made parties, along with Westlawn, on November 2, 1992, which was after the hearing date of October 27, 1992.
Additionally, the judgment provides that depositions be taken of Westlawn employee(s) who were involved in disinterment of the mother's body. At oral argument counsel for Westlawn stated that one of the employees had been deposed.

. Charles Faucheaux, General Manager at West-lawn, testified Westlawn acquired ownership of Jefferson Memorial Gardens in December, 1986.

. The provision authorizing the re-use of cemetery space is La.R.S. 8:660. See note 7, infra.

. Act No. 417, Section 1 (1974) reenacted and amended La.R.S. 8:1 through La.R.S. 8:903. Act No. 939, Section 1 (1990) amended and reenacted La.R.S. 8:655, 8:659 and 8:660.

. 659. Permission to remove remains
A. The remains of a deceased person may be removed from a cemetery space with the consent of the cemetery authority and the written consent of one of the following, in the order named, unless other directions, in writing, have been given by the decedent:
(1) The surviving spouse, if not judicially separated from the decedent.
(2) The surviving adult children of the decedent, not including grandchildren or other remote descendants.
(3) The surviving parents of the decedent.
(4) The surviving adult brothers and sisters of the decedent.
B. If the required consent cannot be obtained, a final judgment of the district court of the parish where the cemetery is situated shall be required.

. 660. Exceptions
The foregoing Sections shall not apply to or prohibit the following:
(1) The removal of any remains from one cemetery space to another in the same cemetery with the consent of the cemetery authority and for the purpose of re-using said cemetery space.
(2) The removal of remains by a cemetery authority from a cemetery space for which the purchase price or any other legitimate indebtedness to the cemetery authority is past due and unpaid, to some other suitable place.
(3) The disinterment of remains pursuant to an order of a court of competent jurisdiction or of a coroner of the parish in which the ' cemetery is located, [footnote omitted].