**YOU VANG YANG, Ia Kue Yang**

v.

**William Q. STURNER, Individually and in his capacity as Chief Medical Examiner for the State of Rhode Island.**

Civ. A. No. 88–0242.

United States District Court,
D. Rhode Island.

Jan. 12, 1990.

Amato DeLuca, Providence, R.I., for plaintiff.

Barbara E. Grady, Sp. Asst. Atty. Gen. State of R.I., Providence, R.I., for defendant.

## OPINION

PETTINE, Senior District Judge.

This sad case pits You Vang Yang and Ia Kue Yang, a couple whose deeply-held religious beliefs prohibit the mutilation of the body through an autopsy, against Rhode Island's chief medical examiner, who performed an autopsy on their deceased son. Making the case all the more tragic are recent developments in the Supreme Court that, applied to this case, leave the Yangs without an adequate remedy under § 1983 to assuage their understandable grief over the death of their son, grief compounded by the treatment of his body at the hands of the defendant.

Believing that the defendant's actions violated their constitutional rights, the Yangs instituted this suit. Now before me are the parties' cross motions for summary judgment and defendant's motion to dismiss based on *Will v. Michigan Dep't of State Police*, — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

## I. BACKGROUND OF THE CASE [1]

The Yangs, members of the Hmong community, immigrated to the United States from Laos.[2] They adhere to the religious beliefs of the Hmongs, one of which prohib-

its any mutilation of the body, including autopsies or the removal of organs during an autopsy.[3]

On December 21, 1987, their son, Neng Yang, then 23 years old, suffered a seizure while he was sleeping. He lost consciousness. An ambulance rushed him to Rhode Island Hospital. Despite the efforts of the hospital staff, Neng Yang never regained consciousness and died three days later, on December 24. The doctors in charge of Neng Yang during his short stay at the hospital could not determine the cause of his seizure or of his death. Because of the unexplained nature of Neng Yang's death, Dr. Louis Weiner, an Assistant Resident at Rhode Island Hospital, contacted the state medical examiners' office, as he was required to do by state law. *See* R.I.Gen. Laws § 23–4–7 (1989).

Dr. Edward J. Murray, Assistant Medical Examiner for Rhode Island, accepted jurisdiction for the investigation into Neng Yang's death and had Neng Yang's body delivered to the Medical Examiners' office on the day Yang died. There, without the permission or knowledge of the Yangs, Dr. Sturner performed an autopsy on Neng Yang's body on December 25. The autopsy failed to uncover a cause for Neng Yang's death.

Dr. Sturner, as Chief Medical Examiner, supervises, and has the duty to administer and enforce the laws of Rhode Island concerning, the medical examiners' office. *See id.* § 23–4–5. His office is responsible for "the performance of autopsies, when appropriate, for deaths which in its judgment might reasonably be expected to involve causes of deaths enumerated [in state law]." *Id.* § 23–4–3(3).

Under state law, any person with knowledge of a death occurring "in any manner to suggest the possibility of a criminal act or as the result of violence or apparent suicide, or from a criminal abortion or in

---

**1.** The facts are based on the Agreed Statement of Facts the parties submitted to this Court.

**2.** You Vang Yang is a United States citizen and a resident of Rhode Island; his wife, Ia Kue Yang, is a resident of Rhode Island.

**3.** Defendant does not challenge the sincerity of the Yangs' religious beliefs. Nor does he claim that the Hmongs' prohibition of autopsies is not a basic tenet of their religion. *See Sherbert v. Verner*, 374 U.S. 398, 399 n. 1, 83 S.Ct. 1790, 1791 n. 1, 10 L.Ed.2d 965 (1963).

any suspicious or unusual manner" shall notify the police or the medical examiners' office. *Id.* § 23–4–7. Doctors and hospital personnel, among others, must report to the same office any death occurring

in any unnatural manner, or as the apparent result of the negligence of another person, or as the consequence of any physical or toxic injury incurred while employed, or from the use of any addictive or unidentifiable chemical agent, or from accidental hypothermia, or from an infectious agent capable of spreading an epidemic within the state.

*Id.* § 23–4–7(c).

But the medical examiners' office does not have the authority to investigate a death in all those instances. It has the authority to conduct autopsies,[4] inquests,[5] and postmortem examinations[6] only

where there may be in its judgment a reasonable belief that the manner of death could be pronounced as:

(1) Death by homicide, suicide, or casualty;

(2) Death due to criminal abortion;

(3) Death due to an accident involving lack of due care on the part of a person other than the deceased;

(4) Death which is the immediate or remote consequences of any physical or toxic injury incurred while the deceased person was employed;

(5) Death due to the use of addictive or unidentifiable chemical agents; or

(6) Death due to an infectious agent capable of spreading an epidemic within the state.

*Id.* § 23–4–4. Sturner justifies his autopsy of Neng Yang as necessary to "ensure that the cause of death was not attributable to some act or agent that posed a threat to the health, safety and welfare of the citizens of ... Rhode Island." Defendant's Memorandum in Support of a Motion for Summary Judgment at 8. Alternatively, he argues that the significantly more lenient regulations his office promulgated under the authority of state law authorized the autopsy of Neng Yang:

Autopsies shall be performed by the Medical Examiner in those cases where, in the judgement [sic] of the Medical Examiner, the cause of death cannot be established with a reasonable degree of certainty.... In such cases autopsies may be performed by the Medical Examiner on all reportable deaths without requiring permission of next of kin or legal representative.

Rhode Island Department of Health, Office of State Medical Examiners, Regulation 806.1.

The Yangs, on the other hand, claim that the statute and regulations, facially and as applied by Sturner, violate their first amendment right to exercise their religion freely and their fourteenth amendment rights to due process and equal protection. The Yangs also argue that Sturner acted outside the authority vested in his office by the statute and regulations and that the regulations exceed the authority of the statute. Finally, they contend that Sturner committed a tort against them when he performed the autopsy. They seek declaratory relief, compensatory and punitive damages, costs, and attorneys' fees. Jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and pendent and ancillary jurisdiction.

## II. DEFENDANT'S MOTION TO DISMISS

Dr. Sturner argues, correctly, that the Supreme Court in *Will* foreclosed § 1983

---

**4.** "The term 'autopsy' shall mean the dissection of a dead body and the removal and examination of bone, tissue, organs and foreign objects for the purpose of determining the condition of the body, the cause and the manner of such death." R.I.Gen.Laws § 23–4–1(d).

**5.** "The term 'inquest' shall mean an official judicial inquiry before a medical examiner and/or medical examiner jury for the purpose of determining the manner of death." *Id.* 23–4–1(e).

The medical examiners' office "shall be responsible for ... the conduct of inquests when requested by the attorney general." *Id.* § 23–4–3(2).

**6.** "The term 'postmortem examination' shall mean examination after death and shall include an examination of the dead body and surroundings by an agent of the office of state medical examiners but shall not include dissection of the body for any purpose." *Id.* § 23–4–1(d).

suits[7] for damages against states, and state officials acting in their official capacity, because states are not "persons" for the purpose of § 1983. *See Will*, 109 S.Ct. at 2312. Justice White, writing for the Court, observed that "[o]bviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." *See id.* at 2311 (citation omitted).[8]

■■■■ The Yangs attempt to evade *Will* by claiming that, because the Court argued that § 1983 did not override common law sovereign or eleventh amendment immunity, states are still "persons" under § 1983 if they have waived their immunity to suit. Therefore, according to the Yangs, because Rhode Island has waived its immunity, *see Della Grotta v. Rhode Island*, 781 F.2d 343, 347 (1st Cir.1986); *Marrapese v. Rhode Island*, 500 F.Supp. 1207, 1223 (D.R. I.1980); *Laird v. Chrysler Corp.*, 460 A.2d 425, 430 (R.I.1983), it can still be sued for damages under § 1983. Unfortunately, plaintiffs impermissibly telescope the analysis under § 1983 and the eleventh amendment. The scope of § 1983 and the eleventh amendment are separate issues. *See Will*, 109 S.Ct. at 2309. A state may waive its eleventh amendment immunity and still not be a "person" under § 1983. *Compare Della Grotta*, 781 F.2d at 348 n. 6 ("That a state may be immune from suit [under the eleventh amendment] does not require the conclusion that it is not a 'person' under [§ 1983]."). The scope of § 1983 is determined by plain language of the statute and the legislative history and congressional intent supporting it, *see Will*, 109 S.Ct. at 2308–11, considerations that have little relevance to the scope of a state's eleventh amendment immunity. Given the holding in *Will*, this Court has no alternative but to dismiss the Yangs' damage claim under § 1983 against Dr. Sturner in his official capacity.

All is not lost for the Yangs, however. Their request for declaratory relief[9] and their state law claims remain viable. In addition, they have an implied cause of action for damages against Dr. Sturner under *Bivens v. Six Unknown Named*

---

**7.** 42 U.S.C. § 1983 (1982) reads:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**8.** *Will* leaves the Yang's suit for declaratory relief untouched. It only applies to § 1983 suits for retrospective damages. Suits for prospective relief " 'are not treated as actions against the State' " and therefore states are still "persons" for the purpose of those actions. *See Will*, 109 S.Ct. at 2311 n. 10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).

**9.** Dr. Sturner argues that the Yangs' request for declaratory relief is moot. This Court disagrees. Dr. Sturner's action is "capable of repetition, yet [it] evad[es] review." *See, e.g., Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). To benefit from this doctrine, a plaintiff must show that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam), *quoted in Boston Teachers Union, Local 66 v. Edgar*, 787 F.2d 12, 17 (1st Cir.1986). The first requirement should not hamper this Court here. An autopsy takes little time to complete, and the coroner performs it soon after a person dies, perhaps without the knowledge of the next of kin. The challenge to the procedure, or to the authorizing statute or regulation, would take considerably longer to litigate fully and, given the circumstances surrounding an autopsy, probably would be instituted after the coroner completes the autopsy. *See, e.g., Dionne v. Bouley*, 757 F.2d 1344, 1348 (1st Cir.1985). Nor is the second prong an obstacle for this Court. The Yangs need not show that a "demonstrated probability" exists, or that it is more likely than not, that they will be subject to the same action of the coroner again. *See Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 601–02 n. 6, 98 L.Ed.2d 686 (1988). It is sufficient that they have a "reasonable expectation" that should another of their next of kin die and the cause of death fall outside the statute, the coroner will feel compelled to perform an autopsy on the deceased relative. That expectation is present here.

*Agents of the FBI,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

### III. THE YANGS' *BIVENS* ACTION

█ There can be little question that this Court has the power to allow the Yangs to sue directly under the Constitution to enforce their constitutional rights.[10] "'[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id.* at 392, 91 S.Ct. at 2002 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)); *see also Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right."). The Constitution is not a complex legal code, *see Davis v. Passman,* 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979) (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 314, 407, 4 L.Ed. 579 (1819)), but rather designates rights that the judiciary has the primary duty to enforce. *See id.* "[U]nless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." *Id.* 442 U.S. at 242, 99 S.Ct. at 2275. And litigants, such as the Yangs, are not limited to injunctive or declaratory relief: "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens,* 403 U.S. at 395, 91 S.Ct. at 2004. It follows that "'where legal rights have been invaded, and a federal statute provides a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Id.* at 396, 91 S.Ct. at 2004 (quoting *Bell,* 327 U.S. at 684, 66 S.Ct. at 777).

Although *Bivens* allowed a direct cause of action under the fourth amendment, and neither the Supreme Court [11] nor the First Circuit has addressed the availability of a similar suit under the first amendment, the distinction between the first and fourth amendment should not hinder this Court. *See Paton v. La Prade,* 524 F.2d 862, 869 (3d Cir.1975); *Yiamouyiannis v. Chemical Abstracts Serv.,* 521 F.2d 1392, 1393 (6th Cir.1975), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1978). The first amendment provides substantive protection for the Yangs, *see* Dellinger, *Of Rights and Remedies: The Constitution as a Sword,* 85 Harv.L.Rev. 1532, 1551 (1972) (In a *Bivens* suit, "the court must first determine that the implicated constitutional provision provides substantive protection to one in the position of the plaintiff."), through its affirmative command that the government shall not interfere with the free exercise of their religion. *See* U.S. Const.Amend. I; *see also* Steinman, *Backing Off* Bivens *and the Ramifications of This Retreat for the Vindication of First Amendment Rights,* 83 Mich.L.Rev. 269, 298 (1984) (The first amendment "creates duties in the government, and bestows correlative rights upon the people of the United States."). As with the fourth amendment right to be free from unreasonable searches and seizures, the first amendment protections for religious belief "suggest[ ] a corresponding duty upon government officials to refrain from behavior which would impair that right." *See* Dellinger, 83 Harv.L.Rev. at 1540.

Of course, "the appropriateness of money damages may well vary with the nature of the personal interest asserted" and the

---

**10.** Jurisdiction is founded on 28 U.S.C. § 1331.

**11.** In *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Court assumed *arguendo* that the defendant had violated the plaintiff's first amendment rights, *see id.* at 372, 103 S.Ct. at 2408, but it denied a *Bivens* action because it considered the civil service remedies established by Congress adequate alternatives to a direct suit. *See id.* at 388–90, 103 S.Ct. at 2416–17. Therefore, *Bush* does not help neither Dr. Sturner, because no similarly effective alternative exists here.

ability of the court to determine damages. *Bivens*, 403 U.S. at 409 & n. 9, 91 S.Ct. at 2011 & n. 9 (Harlan, J., concurring). But to jump from that proposition to a denial of a direct cause of action under the first amendment would ignore the primacy of religious tolerance in the Bill of Rights. *See Braunfeld v. Brown*, 366 U.S. 599, 612, 81 S.Ct. 1144, 1150, 6 L.Ed.2d 563 (1961) (Brennan, J., concurring and dissenting) ("[R]eligious freedom—the freedom to believe and to practice strange and, it may be, foreign creeds—has classically been one of the highest values of our society."). "First amendment rights must be as personal to an individual as are fourth amendment rights." *Paton*, 524 F.2d at 869–70. And the damages the Yangs claim here, emotional distress and mental anguish, are familiar remedies that this Court has faced in common law tort actions.[12] Certainly given its experience, this Court is "capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation" for the invasion of the Yangs' rights. *Bivens*, 403 U.S. at 409, 91 S.Ct. at 2011 (Harlan, J., concurring); *see also Dellums v. Powell*, 566 F.2d 167, 195 (D.C.Cir.1977) (First amendment damage awards "no less administrable than damage awards for other intangible interests protected by the Constitution or at common law."), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

A *Bivens* cause of action can only be defeated, *see Carlson v. Green*, 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980), when "special factors counselling hesitation in the absence of affirmative action by Congress" exist, *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004; *see also Carlson*, 446 U.S. at 18, 100 S.Ct. at 1471, or when

"Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Id.* at 18–19, 100 S.Ct. at 1471 (citing *Bivens*, 403 U.S. at 397, 91 S.Ct. at 2005); *see also* Dellinger, 85 Harv.L.Rev. at 1551 ("The focus [in a *Bivens* suit] should ... be upon whether there are other remedies available to those in the plaintiff's position that would as fully effectuate the purposes of the constitutional guarantee as the remedy sought."). Neither limitation applies in this case.

First, Dr. Sturner's position in the state government does not make this Court hesitate in favoring a *Bivens* suit against him. He does not "enjoy such independent status in our constitutional scheme as to suggest that judicially created remedies against [him] might be inappropriate." *Carlson*, 446 U.S. at 19, 100 S.Ct. at 1472. Whatever protection he may need against a *Bivens* suit can be provided by the qualified immunity that may cloak him. *See id.*

Second, the alternative remedies available to the Yangs fall far short of providing the compensation and protection of a damage suit. They cannot seek vindication through an elaborate administrative process established by Congress. *See Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (first amendment *Bivens* suit rejected because of congressionally enacted elaborate civil service review system). And the prospective declaratory relief that remains viable for the Yangs under § 1983 (and injunctive relief had they requested it) only protects them against future constitutional torts. "[I]t would afford no remedy at all for the constitutional violations already suffered. As

12. By its order of March 6, 1989, entered after a conference with counsel, this Court bifurcated this case into a determination of liability through summary judgment motions and, if it granted summary judgment for the plaintiffs, an award of damages after briefings and a hearing. This Court will follow the law of Rhode Island as to the damages due in this case. Because the Yangs ground their claim for damages on the emotional distress and mental anguish caused by Dr. Sturner's autopsy on their son, they must show that they suffered some physical manifes-

tation of their emotional distress before they can recover. *See Reilly v. United States*, 547 A.2d 894, 896 (R.I.1988). This Court became concerned that, given the absence of any allegation of physical symptoms in the plaintiffs' averments, its holding that the Yangs have a *Bivens* claim would be an empty victory. After receiving affidavits from the Yangs detailing their physical symptoms, however, this Court feels that they have at least a colorable claim for damages.

to those violations of [their] rights, prospective relief is no relief at all." Steinman, 83 Mich.L.Rev. at 283; *see also id.* at 298 ("Rarely, if ever, will declaratory or injunctive relief for the future make up for a past injury" to first amendment rights.). As for Walter Bivens, for the Yangs "it is damages or nothing." *Bivens,* 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring). Bivens could not have had the time or opportunity to brandish an injunction to stop the unexpected, illegal intrusion of the agents. *See id.*[13] Similarly, the Yangs did not and would not have the chance to rush to a court for an injunction to stop an autopsy. They certainly could protest the autopsy, but given the present regulations, their lack of consent would be no barrier.

Some courts, before *Will,* considered a § 1983 damage suit an effective alternative to a *Bivens* suit. *See, e.g., Williams v. Bennett,* 689 F.2d 1370, 1390 (11th Cir. 1982) (The "alternative remedy under section 1983 provides an adequate substitute for direct action under the eighth and fourteenth amendment."), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir.1981) ("Ward seeks to extend *Bivens* against state defendants even when those defendants are subject to the federal statutory remedy of § 1983. Such an expansion of *Bivens* is unwarranted."). Some may still argue that § 1983 remains an effective alternative for the Yangs to vindicate their rights. In the face of *Will* and the indispensability of a damage remedy for the Yangs, that argument cannot hold up. For § 1983 to be an alternative for a *Bivens* suit, Congress must explicitly declare that § 1983 is an equally effective substitute for a *Bivens* claim against state officials acting in their official capacity. *See Carlson,* 446 U.S. at 18–29, 100 S.Ct. at 1471. In fact, as discussed *supra,* the lesson of *Will* is that Congress never intended § 1983 to allow damage suits against the state, or state officials in their official capacities. *See Will,* 109 S.Ct. at 2309.

Moreover, although *Will* held that Congress excluded states from § 1983, this holding does not warrant a similar exclusion under *Bivens.* The first issue is determined by congressional intent: "[I]n enacting § 1983, Congress did not intend to override well-established immunities or defenses under common law." *Will,* 109 S.Ct. at 2309. The second issue rests on an analysis of the eleventh amendment.

The eleventh amendment remains a barrier to any *Bivens* suit against states or state officials acting in their official capacity. But Rhode Island, through the enactment of its Tort Claims Act, R.I.Gen.Laws § 9–31–1 et seq., has waived its immunity to suit in federal court. *See Della Grotta,* 781 F.2d at 347; *Marrapese,* 500 F.Supp. at 1223; *Laird,* 460 A.2d at 430. Dr. Sturner contends that the waiver only extends to conduct that would be "in the nature of a tort at common law." That limitation does not bar the Yangs' suit. Surviving kin possess a "quasi-property" right in the body of the deceased, *see Pierce v. Proprietors of Swan Point Cemetery,* 10 R.I. 227, 238 (1872); *Sullivan v. Catholic Cemeteries,* 113 R.I. 65, 317 A.2d 430, 432 (1974), that creates a liability against anyone who tortiously interferes with that right by mutilating or operating on the body. *See, e.g., Kohn v. United States,* 591 F.Supp. 568 (E.D.N.Y.1984) ("next of kin have the right to possession of the dead body and ... they may have damages for the injury to their feelings from any wrongful handling of the corpse."), *aff'd mem.,* 760 F.2d 253 (2d Cir.1985); Restatement (Second) of Torts 868 (1979) (same).

Dr. Sturner contends, citing *Avery v. Rhode Island Hospital,* 495 A.2d 254 (R.I. 1985), that even if this Court finds that the Yangs have a common law right, that right

---

**13.** Nor could he use the "exclusionary rule" to suppress the tainted evidence. *See Bivens,* 403 U.S. at 410, 91 S.Ct. at 2012. Webster Bivens was the victim of a warrantless search by FBI agents who had no probable cause for his arrest. They "manacled [Bivens] in front of his wife and children, and threatened to arrest the entire family. They searched the apartment from stem to stern." *See id.* at 389, 91 S.Ct. at 2001. Although Bivens was booked for narcotics violations, the charges against him were dropped; he was never prosecuted and therefore did not have the protection of the "exclusionary rule."

has been abrogated by the Rhode Island autopsy statute. In *Avery* the Rhode Island Supreme Court held that R.I.Gen. Laws §§ 23–4–4 & 23–4–7 intentionally abrogated the next of kin's common law quasi-property right, if the cause of the death under investigation is due to one of the statutorily enumerated factors. The underlying facts of *Avery* clearly fell "within the parameters of § 23–4–4," *id.* at 257, and § 23–4–7. In *Avery,* a 1,000 to 2,000 pound "sheet of structural steel" crushed and killed Avery's husband while he was working on a jobsite as a pile-driver crew foreman. *See id.* at 255 n. 2. Under the statute, a physician must report a death that occurs "as the apparent result of the negligence of another person, or as the consequence of any physical ... injury incurred while employed." R.I.Gen.Laws § 23–4–7. The medical examiner can perform an autopsy if he has a reasonable belief that the death occurred as "the immediate or remote consequence of any physical ... injury incurred while the deceased was employed." *Id.* § 23–4–4. In contrast, Neng Yang's death was not caused by homicide, suicide, casualty, criminal abortion, another person's negligence, physical or toxic injury on the job, addictive or unidentifiable chemical agents or an infectious agent. *See id.* Because Neng Yang's death falls outside the statute, the Yangs' common law right remains viable.

This Court's willingness to allow a *Bivens* action for the Yangs receives support from those courts that, prior to *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), allowed direct suits against municipalities because municipalities were not considered "persons" for the purposes of § 1983. *See, e.g., Owen v. City of Independence,* 560 F.2d 925, 933 (8th Cir.1977), *vacated,* 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978); *Brault v. Town of Milton,* 527 F.2d 730, 735 (2d Cir.1975), *rev'd on other*

*grounds,* 527 F.2d 736 (2d Cir.1975) (en banc). More than one court reasoned that holding municipalities liable comes "within *Bivens* sweeping approbation of constitutionally-based causes of action." *Brault,* 527 F.2d at 734; *Panzarella v. Boyle,* 406 F.Supp. 787, 792–93 (D.R.I.1975). True, in *Kostka v. Hogg,* the First Circuit declined to imply a cause of action against municipalities under the fourteenth amendment, *see* 560 F.2d 37 (1st Cir.1977), but it carefully limited its opinion to the facts of the case. *See id.* at 45. Specifically, it expressed "no opinion as to whether specific [constitutional] guarantees ... might require a direct damages action against a political subdivision." *Id.* The constitutional admonition against government interference in the free exercise of religion is precisely such a specific guarantee. Most importantly, however, the plaintiff in *Hogg* attempted to hold the municipality vicariously liable through *respondeat superior* for the allegedly unconstitutional acts of its employee, a theory that remains unrecognized under § 1983. The Yangs, in contrast, seek to hold a state official liable for his own actions.[14]

Finally, allowing a *Bivens* action would create a deterrence to official violations of constitutional rights that is no longer present under § 1983. *Cf. Carlson,* 446 U.S. at 21, 100 S.Ct. at 1472 (comparing *Bivens* and the Federal Tort Claims Act). The genuine fear that such deterrence may keep officials from acting at all is mitigated by the protection they receive from qualified immunity.

This Court therefore feels that a *Bivens* action is the only avenue open to the Yangs to secure vindication for their constitutional rights.

## IV. DR. STURNER'S QUALIFIED IMMUNITY

■ Dr. Sturner attempts to invoke the doctrine of qualified immunity to protect

---

**14.** Dr. Sturner argues that because the Supreme Court has only applied *Bivens* in cases arising under the fourth amendment (*Bivens*), the due process clause of the fifth amendment (*Davis*), and the cruel and unusual punishment clause of the eighth amendment (*Carlson*), this Court cannot apply *Bivens* to a case arising under the

first amendment. He overlooks the absence of any decision by the Supreme Court denying a *Bivens* action in a first amendment context analogous to this case. Until such a decision is handed down, this Court can entertain the Yangs' *Bivens* suit.

himself from the Yangs' suit.[15] Qualified immunity shields government officials performing discretionary functions. *See Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). A medical examiner performing an autopsy is analogous to a police officer investigating a crime. *See Kompare v. Stein,* 801 F.2d 883, 887 (7th Cir.1986). Both are accorded qualified immunity. *See id.* at 887; *Lawyer v. Kernodle,* 721 F.2d 632, 635 (8th Cir.1983).

Qualified immunity does not, however, protect Dr. Sturner from all liability. The doctrine is a careful balance between the interests of plaintiffs, such as the Yangs, for whom a damage suit is the "only realistic avenue for vindication of constitutional guarantees," *see Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736, and the costs of such suits to innocent defendants and society. *See id.* The societal costs include "the expense of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* Therefore, the Court in *Harlow* held that "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

The question is whether the right Dr. Sturner violated is "clearly established." The latest pronouncement by the Court does little more than restate the rule: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). This Court must look, however, to "preexisting law" to see if the "unlawfullness" is apparent. *See id.; see also Yerardi's Moody Street Rest. v. Board of Selectmen,* 878 F.2d 16, 20 (1st Cir.1989) ("We first examine the law, to determine wheth-

er the right allegedly violated was 'clearly established'; if so, the defendant should reasonably have known of the right.").

A medical examiner should know the law governing his conduct, *see Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738, and any developments in his field. In similar situations, courts have stopped coroners from performing autopsies because the operation violated the surviving kin's religious beliefs. *See, e.g., Atkins v. Medical Examiner,* 100 Misc.2d 296, 418 N.Y.S.2d 839 (Sup. Ct.1979); *Weberman v. Zugibe,* 90 Misc.2d 254, 394 N.Y.S.2d 371 (Sup.Ct.1977); *Wilensky v. Greco,* 74 Misc.2d 512, 344 N.Y. S.2d 77 (Sup.Ct.1973); *cf. Smialek v. Begay,* 721 P.2d 1306, 104 N.M. 375 (Navajo mother has standing to bring first amendment challenge to autopsy), *cert. denied,* 479 U.S. 1020, 107 S.Ct. 677, 93 L.Ed.2d 727 (1986). *But see Snyder v. Holy Cross Hosp.,* 30 Md.App. 317, 352 A.2d 334 (1976). The Hmongs are not the only people to believe that the sanctity of the body prohibits its dissections or autopsies. "Judaism believes in the principle that body and soul are sacred because both are the handiwork of God and hence are entitled to reverence.... [T]he whole body should be buried, and if parts have been removed, for examination or otherwise, they must be returned and buried with the rest of the body.... [or] the soul of the deceased will find no rest...." *Kohn,* 591 F.Supp. at 572–73; *see Atkins,* 418 N.Y.S.2d at 840; *Weberman,* 394 N.Y.S.2d at 372; *Wilensky,* 344 N.Y.S.2d at 78. In *Atkins,* the coroner wanted to perform an autopsy on a 78–year–old woman to determine whether her death, seven days after she was struck by an automobile, was caused by the accident or by natural causes. The state law in force at that time was broader than the present law in Rhode Island. The New York statute gave the medical examiner "authority ... to investigate deaths and to perform autopsies when in his opinion it is necessary either to establish the cause of

---

**15.** Qualified immunity would apply regardless of whether the Yang's sued under § 1983 or directly under the first amendment. *See Harlow v. Fitzgerald,* 457 U.S. 800, 809, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1981) (quoting *Butz,* 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

death or determine the means or manner thereof." *Atkins,* 418 N.Y.S.2d at 840. The Court held that "[t]he individual's right of free choice in such an important area as religion must prevail over the State's curiosity as to the cause of death." *Id.; see also Weberman,* 394 N.Y.S.2d at 372 ("The desire of the Medical Examiner to perform an autopsy merely to determine whether the decedent died by reason of injury to one vital organ as opposed to another is far outweighed by the reasons advanced by the decedent's family for opposing the autopsy."); *Wilensky,* 344 N.Y.S.2d at 78 (same). In support of his actions, Dr. Sturner can only uncover one case in which a court upheld the autopsy against the religious beliefs of the surviving kin. In *Snyder v. Holy Cross Hospital,* an 18–year–old boy collapsed while at home, fell to the floor, and sank into unconsciousness. He died before the ambulance could get him to the hospital. Because doctors at the hospital could not determine the cause of death, they called in the state medical examiners' office to perform an autopsy. The decedent's parents objected on religious grounds. Unlike the Rhode Island statutes, however, the Maryland law at that time allowed the medical examiner to perform an autopsy when someone died "suddenly when in apparent health." *See Snyder,* 352 A.2d at 337. Also unlike the facts of this case, the regulations implementing the statute strictly echoed the law by allowing autopsies in "a death of an apparently healthy person." *Id.* at 338. In the face of explicit statutory and regulatory language that unquestionably governed the case, the court held that the state's interest in performing the autopsy outweighed the parent's interest in prohibiting it. *See id.* at 342.

This Court is further persuaded that the Yangs have a clearly established constitutional right by the presence of statutes in several states that require medical examin-

ers to refrain from performing autopsies over the objections on religious grounds of the next of kin. *See* Cal.Gov't Code § 27491.43 (West 1989); N.J.Stat.Ann. § 52:17B–88.2 (1989); N.Y.Pub.Health Law § 4210–c (McKinney 1988); Ohio Rev.Code Ann. § 313.13.1 (Anderson 1989). The states mandate that the coroner must not perform an autopsy if a member of the family (or a friend) protests on religious grounds or, more importantly, if the coroner has reason to believe the autopsy would violate the decedent's religious beliefs.[16] The laws provide an exception only in the event of "compelling public necessity." *See* N.J.Stat.Ann. § 52:17B–88.2. In New York, the term means "that discovery of the cause of death is necessary to meet an immediate and substantial threat to the public health and that a dissection or autopsy is essential to ascertain the cause of death." N.Y.Public Health Law § 4210–c(2)(a)(ii); *see* Ohio Rev.Code Ann. § 313.13.1(C)(1) ("An autopsy is a compelling public necessity if it is necessary ... to establish the cause of the deceased person's death for the purpose of protecting against an immediate and substantial threat to the public health.").[17] That these statutes allow autopsies only in the gravest of circumstances is evidence of the clear, defined right the next of kin have in protecting their religious beliefs against the incursion of the medical examiner.

It is not, however, "sufficient for a court to ascertain in a general sense that the alleged right existed." *Borucki v. Ryan,* 827 F.2d 836, 838 (1st Cir.1987). "[T]he law regarding the alleged violation may have been clearly enunciated but application of that law to the facts may be unclear." *Id.* Therefore, this Court must examine Dr. Sturner's actions to see if they violate constitutional standards known by a "reasonable" medical examiner. Such an examiner would know that certain people and religions abhor autopsies as a violation

**16.** California prohibits the autopsy only if the decedent, prior to death, has filed a certificate opposing the procedure as "contrary to his or her religious belief." *See* Cal.Gov't Code § 27491.43(a)(1).

**17.** California allows the coroner to perform an autopsy "if he or she has a reasonable suspicion that the death was caused by ... a contagious disease constituting a public health hazard." Cal.Gov't Code § 27491.43(c).

of their deeply held beliefs. Such an examiner would know which religions and people hold those beliefs. Such an examiner would realize that the Hmong population in Rhode Island has grown, particularly in the last ten years. Such an examiner would know that the Hmongs prohibit autopsies; public officials should be knowledgeable of, and sensitive to, the many beliefs held by Rhode Island's citizens. Therefore, it is reasonable to believe that when a medical examiner receives the body of a person who might be a Hmong,[18] he should realize that an autopsy would violate the religious beliefs of the decedent's next of kin. This conclusion is strengthened if the Yangs' uncontested allegation that they expressed their opposition to an autopsy to the doctors at Rhode Island Hospital is true.

Given the Yangs' clearly established rights and the specific facts of this case, this Court denies Dr. Sturner's request for qualified immunity.

## V. THE YANGS' FIRST AMENDMENT CLAIMS

The free exercise clause of the first amendment prohibits government interference with religious beliefs, *see Wisconsin v. Yoder,* 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The government can, however, regulate conduct "prompted by religious beliefs or principles" if that conduct poses "some *substantial threat* to public safety, peace or order." *Sherbert,* 374 U.S. at 403, 83 S.Ct. at 1793.[19] "But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control...." *Yoder,* 406 U.S. at 220, 92 S.Ct. at 1535. As Justice Douglas so eloquently wrote, in language especially appropriate to this case, "[M]any people hold beliefs alien to the majority of our society—beliefs that are protected by the First Amendment but which could easily be trod upon under the guise of 'police' or 'health' regulations reflecting the majority's views." *Sherbert,* 374 U.S. at 411, 83 S.Ct. at 1798 (Douglas, J., concurring). To guard against that very danger, "any incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate....'" *Id.* at 403, 83 S.Ct. at 1793 (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)).[20] The *Sherbert* Court cautioned that "'only the gravest abuses, endangering paramount interests,

**18.** It is unclear to this Court whether records available to the medical examiners' office would have disclosed that Neng Yang was a Hmong.

**19.** The threshold questions of whether the prohibition of autopsies is a basic tenet of Hmong faith and whether the Yangs sincerely believe and practice the Hmong faith, *Wisconsin v. Yoder,* 406 U.S. 205, 209, 216, 92 S.Ct. 1526, 1530, 1533, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 399 n. 1, 83 S.Ct. 1790, 1791 n. 1, 10 L.Ed.2d 965 (1963), are not at issue in this suit, given the defendant's decision to accept the Yangs' allegations on these points. *See supra* note 3.

**20.** Dr. Sturner does not contend that his actions did not violate the Yangs' religious beliefs, nor could he. *See New Life Baptist Church Academy v. Town of East Longmeadow,* 885 F.2d 940, 944 (1st Cir.1989). Moreover, the degree to which he compromised the Yangs' rights warrants this Court's strict scrutiny of his actions. *See Alex-ander v. Trustees of Boston University,* 766 F.2d 630, 643 (1st Cir.1985). The autopsy clearly violated their beliefs to an extent greater than did the state action in either *Sherbert* or *Yoder.* *Sherbert* involved the unconstitutional denial by the state of unemployment benefits because the plaintiff would not accept suitable work that required her to work on Saturdays, a holy day for Seventh Day Adventists. In *Yoder,* the state required students to stay in school past the eighth grade. Amish parents, believing that their childrens' attendance in high school would violate their religious beliefs, refused to follow the compulsory attendance law. They were charged, tried, convicted, and fined for their actions, but prevailed in the Supreme Court. In both cases, the plaintiffs had a choice to accede to the demands of the state, and abandon one of the precepts of their religion, or maintain their faith and forfeit state-provided benefits or face prosecution. Here, on the other hand, the Yangs had no choice.

give occasion for permissible limitation.'" *Id.* at 406, 83 S.Ct. at 1795 (quoting *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945)). Moreover, the state must choose the least restrictive alternative when it places an incidental burden on religious beliefs. *See, e.g., Thomas v. Review Board,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *New Life Baptist Church Academy v. Town of East Longmeadow,* 885 F.2d 940, 944 (1st Cir.1989); *Murphy v. Arkansas,* 852 F.2d 1039, 1041 (8th Cir.1988); *Leahy v. District of Columbia,* 833 F.2d 1046, 1049 (D.C.Cir.1987); *Callahan v. Woods,* 736 F.2d 1269, 1272, 1273 (9th Cir.1984); *Forest Hills Early Learning Center, Inc. v. Lukhard,* 728 F.2d 230, 241 (4th Cir. 1984), *cert. denied,* —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

■ The interests Dr. Sturner identifies fall far short of being compelling. Although this Court has difficulty determining exactly which interests Dr. Sturner felt he was promoting by performing an autopsy on Neng Yang, it can discern one general interest he puts forward. Dr. Sturner felt that the autopsy was necessary to protect "the health, safety and welfare" of Rhode Island residents by making sure Neng Yang did not die because of "an infectious agent capable of spreading an epidemic within the state." [21] Unfortunately, Dr. Sturner does not go beyond those broad, conclusory statements to establish the basis for his belief, which he must have before he performs the autopsy, *see* R.I. Gen.Laws § 23-4-4, that such a lethal infectious agent struck Neng Yang. He alludes to unspecified "similar deaths among the Rhode Island Southeast Asian [and Hmong] population in recent years," without disclosing the number of deaths that have occurred, the nature of those deaths and their similarity with Neng Yang's death, the number of deaths, if any, caused by a "contagious disease capable of an epidemic within the state," or the span of years in which the deaths have occured. Finally, Dr. Sturner cannot use past admin-istrative practices to support the violation of the Yangs' religious beliefs. To say that the medical examiner has performed autopsies in similar situations in the past does no more than admit that he acted in a way that may have violated other individuals' religious beliefs.

In his defense, Dr. Sturner turns the Rhode Island statute on its head. In his interpretation, an autopsy should be performed to create a reasonable belief, or medical conclusion, that the death was caused by one of the statutorily enumerated factors: "Where otherwise normal healthy persons die of unknown causes, autopsies are routinely performed because such procedures often reveal evidence of the reason for death falling into one or more of the [statutory] categories." Defendant's Memorandum in Support of a Motion for Summary Judgment at 9. As this Court reads and understands the plain language of the statute, however, the coroner must possess "a reasonable belief" that the death was due to one of the statutory factors before he performs the autopsy. *See* R.I.Gen.Laws § 23-4-4.

Dr. Sturner also attempts to justify his actions as authorized by the medical examiners' regulations. Unfortunately, these regulations cannot provide the protection Dr. Sturner seeks. The regulations exceed the scope of the statutes. Under those administrative rules, he can perform an autopsy when "the cause of death cannot be established with a reasonable degree of certainty." Rhode Island Department of Health, Office of State Medical Examiners, Regulation 806.1. Under the reporting statute, deaths that occur "in any suspicious or unusual manner" must be reported to the medical examiner, *see* R.I.Gen.Laws § 23-4-7, but under the authorizing statute, the medical examiner may only perform an autopsy if he "reasonably believes" the person died because of a homicide, suicide, casualty, criminal abortion, accident involving negligence, physical or toxic injury on the job, addictive or uniden-

---

21. Although the medical examiner can perform an autopsy in five other instances besides "death due to an infectious agent," *see* R.I.Gen.Laws § 23-4-4, Neng Yang's death does not fit in any of the other categories.

tifiable chemical agents or an infectious agent. *See id.* § 23–4–4. The regulations follow the reporting statute, but exceed the bounds of the authorizing statute. "A regulation which ... operates to create a rule out of harmony with the statute is a mere nullity." *Manhatten Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936), *quoted in United States v. Larionoff,* 431 U.S. 864, 873 n. 12, 97 S.Ct. 2150, 2156 n. 12, 53 L.Ed.2d 48 (1977). The regulations are not consistent with the statutory terms, or the legislative intent as evidenced by the clear statutory language, and therefore are invalid. *See, e.g., Planned Parenthood Fed'n of Am., Inc. v. Heckler,* 712 F.2d 650, 655 (D.C.Cir.1983).

Even if the regulations were valid, however, they do not state a "compelling state interest" in performing autopsies sufficient to overcome the Yangs' religious beliefs. Dr. Sturner presents no evidence or argument on how unexplanable deaths harm the health, welfare, or safety of Rhode Island citizens.

Finally, this Court believes that the statute regulating the performance of autopsies is not the least restrictive alternative available to the state to meet their expressed interests. This Court finds it significant that other states have adopted less burdensome statutes, discussed *supra,* that explicitly protect religious beliefs prohibiting autopsies. *See* Cal.Gov't Code § 27491.43 (West 1989); N.J.Stat.Ann. § 52:17B–88.2 (1989); N.Y.Pub.Health Law § 4210–c (McKinney 1988); Ohio Rev.Code Ann. § 313.13.1 (Anderson 1989). That the statutes establish complicated procedures does not weaken this Court's conclusion that any statute recognizes a first amendment prohibition is less burdensome than no statute. Moreover, the medical examiners' office has at its disposal less intrusive methods, such as "postmortem examinations," that would allow it to investigate deaths without performing objectionable autopsies.

Given Dr. Sturner's unsupported justifications for performing an autopsy on Neng Yang, this Court holds that he violated the Yangs' religious beliefs protected by the first amendment.[22]

## VI. CONCLUSION

Having found Dr. Sturner liable for damages to the Yangs based on his actions in performing an autopsy on Neng Yang, this Court sees no further impediment to awarding damages to them. To that end, and pursuant to an agreement between the parties, this Court will hold a hearing to determine the extent of those damages. The date of the hearing will be established after consultation with both parties. Briefs on the issue of damages will be due before the hearing.

---

**22.** Because it finds that the Yangs succeeded on their first amendment claims, this Court expresses no opinion on the strength of their due process and equal protection fourteenth amendment, state law, or state constitutional claims.