**Karen JACOBSEN and Hardy Jacobsen, Plaintiffs,**

v.

**MARIN GENERAL HOSPITAL, California Transplant Donor Network, Inc., and Marin County Coroner's Office, Defendants.**

**No. C–96–3609 MHP.**

United States District Court, N.D. California.

April 16, 1997.

Raphael S. Moore, Sacramento, for Karen M. Jacobsen, Hardy F. Jacobsen, the Estate of Martin Jacobsen.

Warren L. Dranit, Spaulding & McCullough, Santa Rosa, for Marin General Hospital, Henry Buhrmann.

Robert H. Garnett, Lewis D'Amato Brisbois & Bisgaard, San Francisco, for California Transplant Donor Network, Inc., Phyllis Weber.

Allen A. Haim, Office of the County Counsel, San Rafael, for Marin County Coroner's Office.

## MEMORANDUM AND ORDER

PATEL, District Judge.

Plaintiffs Karen and Hardy Jacobsen (collectively, "plaintiffs") brought this action against defendants Marin General Hospital ("Hospital"), California Transplant Donor Network, Inc. ("Network") and Marin County Coroner's Office ("Coroner") alleging various claims under California law arising from the harvesting of organs from the body of their son Martin Jacobsen ("Martin"). This case is before the court pursuant to the court's diversity jurisdiction. 28 U.S.C. § 1332. Now before the court are separate motions to dismiss submitted by all three defendants in this action.

Having considered the parties' arguments and submissions and for the reasons stated below, the court now issues the following memorandum and order.

### BACKGROUND [1]

Plaintiffs are citizens and residents of the Kingdom of Denmark and the parents of Martin Jacobsen, also a Danish citizen. Martin was visiting the United States as a tourist when he was found unconscious and suffering from head trauma in the early morning hours of October 4, 1995 on Northbound 101, south of the Waldo Tunnel in Sausalito, California. The parties do not know how this occurred. Martin was taken to defendant Hospital and admitted at 4:05 a.m. on October 4. At this time, Dr. Morris, the attending physician, presumed he was homeless and indicated that no identification had been made. At 8:25 a.m., defendant Network contacted defendant Coroner requesting organ donation; Coroner denied this request. At 9:00 a.m. on October 4, a search began for Martin's next of kin or other persons authorized to make an anatomical gift.

At 9:30 a.m. on October 4, photos were taken by the Marin County Sheriff's Office ("Sheriff") and the Coroner, where a blue card stating "Jacobsen, M" and "10/4/95" was displayed with the body.[2] At 12:25 p.m., another request for organ donation was made, but Dr. Morris indicated that Martin was not brain dead at that time. At 2:00 p.m., Network called the Sheriff who revealed that the patient had been identified by the FBI as Martin Jacobsen from New York City.

The following day, on October 5, 1995 at 9:00 a.m., Network spoke with the Sheriff who stated that he felt "9/10" sure that the patient was Martin Jacobsen. At 9:40 a.m., Dr. Ramirez made a clinical determination of brain death. At 3:00 p.m., another determination of brain death was made by Dr. Nisam who stated in his report that the patient was being maintained pending identification of next of kin and that an extensive forty hour search by the Sheriff, Coroner, and FBI to find any family member or identification of the patient had been unsuccessful. His report also indicated that the body was "officially released" to Network for organ donation.

On October 6, 1995 around 9:00 a.m., the Sheriff reported to Network that they were unable to locate the identification of "this John Doe." At 10:13 a.m., Network requested

---

1. All facts are taken from the plaintiffs' complaint unless otherwise indicated.

2. The Coroner disputes that these photos were taken on October 4, 1995. The Coroner argues that the pictures were actually taken on October 6, 1995 after the harvesting and that the date on the photos refers to the date on which Martin's body was found.

authorization from Coroner to recover the organs of "John Doe." Coroner consented. Martin's kidney, liver, pancreas and heart were removed and the harvesting was completed at 2:16 a.m. on October 7, 1995.

Neither Martin nor plaintiffs would have consented to the maintenance of Martin's body or the removal of his organs for the purposes of making an anatomical gift. Plaintiffs filed their original complaint on October 4, 1996 and an amended complaint on January 22, 1997. Defendants Hospital, Network and Coroner subsequently filed separate motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

*LEGAL STANDARD*

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco,* 792 F.2d 1432, 1435 (9th Cir. 1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987), *cert. denied sub. nom. Wyoming Community Dev. Auth. v. Durning,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987).

*DISCUSSION*

Plaintiffs' various claims are rooted in the sequence of events culminating in the harvesting of Martin's organs in October 1995. They argue that defendants mutilated his body by maintaining it for harvesting, which was done without their consent. In their first amended complaint, plaintiffs bring the

following six separate causes of action against all three defendants: (1) negligent search; (2) negligence in procuring injury-producing conduct of another; (3) intentional mutilation of a corpse and infliction of emotional distress; (4) negligent mutilation of a corpse and infliction of emotional distress; (5) joint enterprise liability; and (6) violation of equal protection under the fourteenth amendment.

In response, defendants argue that they were complying with the provisions of the Uniform Anatomical Gift Act, adopted by the California legislature in 1988, when they maintained Martin's body and harvested organs from it. Accordingly, they argue that plaintiffs do not state any claims in their first amended complaint for which relief may be granted.

*I. The Uniform Anatomical Gift Act*

Although all fifty states have adopted the Uniform Anatomical Gift Act (the "Gift Act") in some form, there is very little case law interpreting its provisions. *See Kelly–Nevils v. Detroit Receiving Hospital,* 207 Mich.App. 410, 526 N.W.2d 15, 17 (1994). The Gift Act is intended to "make uniform the law with respect to [organ donation] among states enacting it" and is codified in California in the Health and Safety Code. Cal. Health & Safety Code § 7156.5. The Gift Act provides that several classes of people may authorize an anatomical gift: the decedent's (1) attorney-in-fact with power of attorney; (2) spouse; (3) adult son/daughter; (4) either parent; (5) adult brother/sister; (6) grandparent; or (7) guardian/conservator (collectively "next of kin"). *Id.* § 7151(a). If the next of kin, as defined in section 7151(a), cannot be located to provide consent, the coroner or hospital, whichever entity has custody of the body at the time the consent is given, may authorize the anatomical gift so long as several criteria are met, including a reasonable "search" for persons listed in section 7151(a).[3] *Id.* §§ 7151.5(a)-(b).

---

**3.** As Danish citizens, plaintiffs allege that in Denmark, no organs are harvested without the consent of the decedent's next of kin and if no next of kin can be found, Danish law does not permit harvesting in the manner described in the Gift Act.

## II. Equal Protection Claim

In their sixth claim, plaintiffs allege that while implementing the provisions of the Gift Act pertaining to the search for next of kin, defendant Coroner discriminated against plaintiffs because of their alien status. Compl. ¶ 82. They assert that as foreign nationals, they were discriminated against because they were:

> more likely to have a relative of theirs have his or her organs harvested without consent to the detriment of the relatives' right to custody and possession of a decedent. In conducting a search for next of kin, the class of aliens are thus treated differently from the class of non-aliens.

*Id.*

■ In their opposition papers, plaintiffs concede that their constitutional claim for violation of their fourteenth amendment rights implicates only defendant Coroner, *not* defendants Hospital and Network. In response to this claim, defendant Coroner argues that plaintiffs have not properly pleaded an equal protection claim because they do not allege any claim under 42 U.S.C. section 1983 as required in this Circuit. Coroner is correct. The Ninth Circuit has clearly stated that "a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983." [4] *Azul–Pacifico, Inc. v. City of Los Angeles,* 973 F.2d 704, 705 (9th Cir.1992), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). Plaintiffs have not done this and therefore have not properly stated a claim for equal protection in their amended complaint.

■ Although plaintiffs could readily cure this defect if given leave to amend, the claim is so fundamentally futile that leave could not cure its substantive defects. As Coroner argues, plaintiffs lack standing to bring an equal protection claim because the

clause applies only to persons *within* the territorial jurisdiction of the United States. In this case, plaintiffs were in Denmark when the events underlying their complaint took place.

■ The Fourteenth Amendment explicitly states "[n] or shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within *its jurisdiction* the equal protection of the laws." U.S. Const. amend. XIV (emphasis added). In interpreting this language, the Supreme Court has stated that the provisions of the Fourteenth Amendment "are universal in their application, *to all persons within the territorial jurisdiction,* without regard to any differences of race, of color, or of nationality." *Plyler v. Doe,* 457 U.S. 202, 212, 102 S.Ct. 2382, 2392, 72 L.Ed.2d 786 (1982) (emphasis added). Here, it is undisputed that plaintiffs were *not* in United States territory when the events giving rise to their complaint occurred. Accordingly, plaintiffs have no standing to invoke the protections of the Fourteenth Amendment and their equal protection claim against defendant Coroner must be dismissed.

## III. Remaining State Law Claims

Having dismissed the only federal claim in plaintiffs' complaint, the court now considers plaintiffs' remaining state law claims under the court's diversity jurisdiction.[5]

### A. Claims Against Coroner

■ Defendant Coroner argues that plaintiffs' failure to file a claim under the California Tort Claims Act bars all of plaintiffs' state law claims against them. Under the California Tort Claims Act, a plaintiff seeking money damages from local public entities is required to file a claim against such entities not later than six months after the accru-

---

4. Curiously, plaintiffs urge this court to apply a different standard derived from a district court case in the First Circuit that has been withdrawn. *Yang v. Sturner,* 728 F.Supp. 845 (D.R.I. 1990), *withdrawn,* 750 F.Supp. 558 (D.R.I.1990). Clearly, this court must follow current case law in the Ninth Circuit, and therefore finds plaintiffs have improperly pled their constitutional claim.

5. Because plaintiffs' state law claims under the Gift Act present issues of first impression in California law, the court asked plaintiffs' counsel during the hearing on this motion if plaintiffs would prefer to proceed in state court on their remaining claims. Counsel for plaintiffs declined this opportunity, stating that his clients preferred to remain in federal court. There is no question that the court has diversity jurisdiction.

al of the action causing personal injury. Cal. Gov't Code §§ 905, 905.2, 910, 911.2. The Ninth Circuit has found that "failure to comply with state imposed procedural conditions to sue the State bars the maintenance of a cause of action based upon these pendent State claims." *Ortega v. O'Connor,* 764 F.2d 703, 707 (9th Cir.1985), *rev'd in part on other grounds,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987).

■ At oral argument, plaintiffs admitted that they had not filed a claim as required under the Tort Claims Act. Plaintiffs offer no excuse for this non-compliance. Instead, they argue that the Tort Claims Act is inapplicable to them because it only applies where a federal court maintains *supplemental* jurisdiction over state claims, whereas here, the court maintains *original* jurisdiction over plaintiffs' state law claims under its diversity jurisdiction. In support of this contention, plaintiffs apparently rely on the fact that *Ortega* specifically discussed the Tort Claims Act in the context of *pendent* state claims.[6] *Id.* at 707. If true, plaintiffs' proposition would eviscerate state law requirements whenever parties filed their claims in federal court under diversity. Certainly, plaintiffs' misperception is incorrect. Because plaintiffs failed to file a claim with the State Board of Control pursuant to the California Tort Claims Act, plaintiffs are barred from bringing any claims against Coroner in this action.

The court will now consider the substance of plaintiffs' remaining claims against all of the defendants, including Coroner, assuming arguendo that plaintiffs could bring a claim against Coroner.

## B. *Negligent Search Claim*

Plaintiffs argue that the defendants acted negligently in searching for persons authorized to provide consent for an anatomical gift. The Gift Act authorizes a coroner, medical examiner, hospital, or local public health official to release and permit removal of a body part where that institution has custody of a body and after a "reasonable effort has been made to locate and inform" next of kin of their option to make, or object to, an anatomical gift. Cal. Health & Safety Code §§ 7151.5(a)-(c). The court must determine whether the actions taken to locate plaintiffs, as described in the complaint, were reasonable under the requirements of the Gift Act.

■ Neither the parties nor the court has identified California cases interpreting what constitutes a "reasonable" search for next of kin under the Gift Act. Nevertheless, the Gift Act itself provides the court with some guidance. Where a coroner has custody of a body, the Gift Act states that "a reasonable effort [to locate next of kin] *shall be deemed to have been made* when a search for the persons has been *underway for at least 12 hours.*" *Id.* § 7151.5(a)(2) (emphasis added). Similarly, where a hospital has custody of a person who is still alive but expected to die, a reasonable search "may be initiated in anticipation of death, but ... the determination [to release a body for an anatomical gift] may not be made until *the search has been underway for at least 12 hours.*" *Id.* § 7151.5(b) (emphasis added). This search

> shall include a check of local police missing persons records, examination of personal effects, and the questioning of any persons visiting the decedent before his or her death or in the hospital, accompanying the decedent's body, or reporting the death, in order to obtain information that might lead to the location of [next of kin].

*Id.* These provisions suggest that when the legislature adopted the Gift Act, the legislature considered and accepted that some searches for next of kin would be unsuccessful, and that where the next of kin could not

6. Plaintiffs also argue that the state law requirement that parties exhaust administrative remedies under the California Tort Claims Act only applies to pendent claims, and not to those claims before the court under supplemental jurisdiction. Plaintiffs apparently perceive a substantive distinction between "pendent" and "supplemental" jurisdiction. This misperception is presumably derived from *Ortega,* which describes "pendent" state law claims. *Ortega,* 764 F.2d at 707. Plaintiffs are mistaken. In federal court, the change from "pendent" to "supplemental" jurisdiction over state law claims is procedural, rather than substantive, in nature. Congress would certainly be surprised to find that by making this procedural change, they had eviscerated state sovereign immunity.

be located in twelve hours, other institutions would be empowered to release a body in order to fulfill the underlying purposes of the Gift Act. In adopting the Gift Act, the California legislature likely recognized that "[t]ime is usually of the essence in securing donated organs at the time of the donor's death." *Lyon v. United States,* 843 F.Supp. 531, 536 (D.Minn.1994).

By adopting a twelve hour search period and stating that a reasonable search "*shall be deemed* to have been made" once this amount of time has passed, it is clear that the California legislature contemplated (1) a relatively short period of time in which to conduct a search for next of kin and (2) the possibility that such a search might be unsuccessful. Therefore, the court must consider what actions could have reasonably been taken *in a twelve hour period* to determine whether a reasonable search for plaintiffs was conducted.

In plaintiffs' complaint, they state that a search for next of kin began at 9:00 a.m. on October 4 and continued until October 6 between 9:00 and 10:13 a.m., when Coroner released the body for harvesting. Martin had no identification on his person when he was found and brought to the hospital. As alleged in the complaint, the search for plaintiffs lasted about forty-eight hours, but was ultimately unsuccessful. The complaint discloses that the Sheriff was notified and involved in the search efforts, that five hours after the search had begun the FBI identified the body as belonging to Martin Jacobsen from New York City, and that a doctor's report described an extensive forty hour search conducted by the Sheriff, the Coroner and the FBI.

Plaintiffs argue that defendants search was negligent because they should have known he was from Denmark when they found a ring inscribed with Danish writing on Martin's finger and a Danish poem in his pocket.

These facts do not establish that the search was unreasonable. It is quite possible that the hospital and police did not know that the language was Danish. Moreover, even if they could identify the language, these items alone do not immediately suggest nor create the inference that Martin was a Danish citizen.[7] Accordingly, the search for plaintiffs was not negligent simply because defendants did not assume, on the basis of these items, that Martin was from Denmark.

Plaintiffs also argue that the search was negligent because the Sheriff knew that Martin was a tourist and that based on this information, they should have checked the records of the Immigration and Naturalization Service ("INS") during their search for next of kin. The fact that the INS records were not checked during the search does not establish that it was unreasonable. The court notes that a person's status as a tourist in the San Francisco area does not immediately suggest that the person is from a foreign country. Many tourists from all over the United States and the world visit this area. Accordingly, the Sheriff's failure to check INS records upon discovering that Martin was a tourist provides little to support plaintiffs' negligent search claim.

Plaintiffs' description of the search suggests that all reasonable acts were taken to locate plaintiffs and obtain their consent prior to releasing Martin's body for harvesting. The complaint describes a search lasting over forty hours and involving the efforts of the Marin County Sheriff as well as the FBI; such a search is "reasonable" as contemplated by the legislature in adopting the Gift Act. Before Martin's body was released, defendants Hospital and Coroner complied with the Gift Act's provisions and conducted a reasonable, although ultimately unsuccessful, search to locate plaintiffs and obtain their consent.[8] Accordingly, the court finds that

---

**7.** For example, a person may enjoy reading French poems so much that she keeps a copy of her favorite poem in her wallet. It is absurd to think that the mere fact she has a French poem in her wallet suggests that she is a citizen or resident of France. Similarly, here, the Sheriff and the Hospital had no reason to think that simply because Martin carried a Danish poem

and other items inscribed in Danish, that he was a Danish citizen from Denmark.

**8.** The court notes that defendant Hospital had no legal duty under the provisions of the Gift Act to conduct a search for plaintiffs because defendant Coroner was the entity that ultimately gave the final consent and release of the body for harvest-

plaintiffs have failed to state a claim for negligent search against defendants Hospital and Coroner.

■ As for defendant Network, under the provisions of the Gift Act, Network had no legal duty to search for Martin's next of kin or obtain their consent for an anatomical gift. *See* Cal. Health & Safety Code § 7151.5 (placing this duty on other entities including coroners and hospitals). Plaintiffs urge the court to impose this duty on Network based on unspecified "common law" duties for which plaintiffs have provided no authority. The court has found no California cases supporting plaintiffs' position and declines the opportunity to create such a duty here. Accordingly, the court finds that plaintiffs have not stated a claim against Network for negligent search.

## C. *Remaining State Law Claims*

■ Plaintiffs' remaining claims for negligence in procuring injury-producing injury, joint enterprise and negligent and intentional infliction of emotional distress are based on plaintiffs' allegation that defendants mutilated Martin's body by maintaining it prior to harvesting and actually harvesting organs from it. Plaintiffs' contend that all three defendants acted in concert to mutilate the body of their son and obtain organs for transplantation, thereby causing them injury.

Defendants' behavior, as described in plaintiffs' complaint, is consistent with the provisions of the Gift Act. As discussed above, defendants' search for Martin's next of kin complied with the provisions of the Gift Act and constituted a reasonable search. Defendants also acted in compliance with other sections of the Gift Act. For example, hospitals are required to "cooperate in the implementation of the anatomical gift or release and removal of a part." Cal. Health & Safety Code § 7152.5(d). The Gift Act also states that "[e]ach hospital in this state, after consultation with other hospitals and pro-

curement organizations, shall establish agreements or affiliations for coordination of procurement and use of human bodies and parts." *Id.* § 7154.5. When identifying potential organ and tissue donors, hospitals must comply with laws requiring that the coroner be notified of all reportable deaths. *Id.* § 7184(a) (referenced in section 7152.5 of the Gift Act). Prior to harvesting, a donor must be determined to be dead pursuant to the Uniform Determination of Death Act (the "Death Act"). *Id.* §§ 7180–82. Death is "determined by determining that the individual has suffered an irreversible cessation of all functions of the entire brain, including the brain stem" and "there shall be an independent confirmation of death by another physician" before harvesting can take place. *Id.* § 7182. Furthermore, hospitals may contact organ and tissue procurement organizations when a potential donor is identified and ask them to assist in locating the potential donor's next of kin as required under section 7151 of the Gift Act. *Id.* § 7184(c) (referenced in section 7152.5 of the Gift Act).

These provisions suggest that defendants acted in compliance with the Gift Act when they maintained Martin's body and harvested organs from it. Defendants were required, under the provisions of the Gift Act, to cooperate with one another to maintain the body and its organs for transplantation purposes. In accordance with the Gift Act and the Death Act, defendants maintained Martin's body and did not release it for harvesting until after there had been a determination of brain death that was confirmed by another physician. Plaintiffs have not alleged any facts showing that defendants violated the provisions of the Gift Act or acted contrary to the purposes for which it was enacted by the California legislature. Defendants' efforts to comply with the provisions of the Gift Act may not serve as a basis for tort liability. Therefore, plaintiffs can prove no set of facts entitling them to relief on any of their re-

---

ing. *See* Cal. Health & Safety Code § 7151.5. However, the Gift Act contemplates that a hospital might be required to conduct a reasonable search where it has custody of a body prior to its release. *Id.* § 7151.5(b). Here, plaintiffs' complaint clearly states that defendant Coroner released the body; accordingly, only defendant

Coroner had a duty to search for next of kin prior to releasing the body. Defendants make much of this statutory distinction in their papers. However, this point is immaterial in light of the court's finding that the search for plaintiffs was reasonable under the provisions of the Gift Act.

874

maining claims. *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02. Accordingly, plaintiffs' remaining state claims against all three defendants must be dismissed.

*CONCLUSION*

For the foregoing reasons, defendants Coroner, Hospital and Network's motions to dismiss are GRANTED and all claims in plaintiffs' first amended complaint are dismissed with prejudice.

IT IS SO ORDERED.