Lonylyn P. REEVES, Appellant,

v.

Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.

No. 97–672.

United States Court of Veterans Appeals.

June 5, 1998.

Lonylyn P. Reeves, pro se.

Robert E. Coy, Acting General Counsel; Ron Garvin, Assistant General Counsel; Carolyn F. Washington, Deputy Assistant General Counsel; and Gregory W. Fortsch, Washington, DC, on pleading for appellee.

Before NEBEKER, Chief Judge, and KRAMER and STEINBERG, Judges.

KRAMER, Judge, filed the opinion of the Court. NEBEKER, Chief Judge, filed a concurring opinion.

KRAMER, Judge:

The appellant, Lonylyn P. Reeves, appeals an April 4, 1997, decision of the Board of Veterans' Appeals (BVA or Board) denying entitlement to an increased rate of chapter 35 educational assistance benefits. Record (R.) at 4–9. This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. § 7252(a). For the reasons that follow, the Court will affirm the decision of the BVA.

## I. RELEVANT BACKGROUND

The appellant's father served for over 20 years in the U.S. Navy. R. at 11. He died from a service-connected condition on January 20, 1992. R. at 13. In May 1995, the appellant filed a claim for chapter 35 educational assistance benefits as his surviving child. R. at 16–22. With her claim, the appellant provided certification of her enrollment at Far Eastern University, which is located in the Philippines. R. at 24–25. In September 1995, a VA regional office (RO) awarded educational benefits to her at the rate of $202 per month. R. at 27. After receiving the award, she inquired as to why she was not awarded $404 per month, the normal rate for full-time students. R. at 30. The RO replied that under 38 U.S.C. § 3532(d) persons attending institutions located in the Philippines receive 50 cents for each dollar that would normally be awarded. R. at 36. In December 1995, the appellant appealed the amount of the award to the BVA on the grounds that it denied her equal protection under the law. R. at 38. In the April 1997 BVA decision here on appeal, the

Board denied her claim for lack of legal merit. R. at. 4–9.

## II. ANALYSIS

The language of the statute is unambiguous. "If a program of education is pursued by an eligible person at an institution located in the Republic of the Philippines, the educational assistance allowance computed for such person under this section shall be paid at the rate of $0.50 for each dollar." 38 U.S.C. § 3532(d). The appellant does not contest the meaning of this provision nor its applicability to her as a recipient of chapter 35 benefits. Instead, she argues that "[a]s [a] citizen of the United States, [she is] entitled to equal protection of the law, regardless of [the] place of educational institution." Appellant's Informal Brief at 1. Initially, the Court notes that, consistent with the analysis in the recent decision of *Ledford v. West,* the appellant raised this equal-protection claim to the Board. R. at 57. *See Ledford v. West,* 136 F.3d 776 (Fed.Cir.1998).

■ Pursuant to 38 U.S.C. § 7261, the Court has the authority to

(1) decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an action of the Secretary. . . .

38 U.S.C. § 7261(a)(1). Thus, if a constitutional question is properly before the Court, a proposition with which our concurring colleague disagrees, this Court has the power to make determinations regarding it. *See Robinson v. Brown,* 9 Vet.App. 398, 400–01 (1996); *Giancaterino v. Brown,* 7 Vet.App. 555, 557 (1995). As to whether the constitutional issue can be avoided, as the concurrence postulates, it clearly cannot be. First, it should be noted that, although the concurrence mentions the role of the Philippine forces in World War II, the appellant is claiming benefits as a dependent of her father who retired from the *United States* Navy after 20 years of service. R. at 11. Furthermore, the education benefits the appellant is receiving are not available, and have never been available, to veterans of the organized military forces of the government

of the Commonwealth of the Philippines. *See infra.*

Second, the possibility of a constitutional equal protection claim depends upon whether the challenged statute makes classifications, not whether the actions based upon these classifications are fair. *See Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("In assessing an equal protection challenge, a court is called upon . . . to measure the basic validity of the legislative classification."); *Johnson v. Robison,* 415 U.S. 361, 374, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) ("our analysis of the classification proceeds on the basis that . . . an individual's right to equal protection of the laws does not deny the power to treat different classes of person in different ways" (internal quotations omitted)); *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (to decide whether law violates Equal Protection Clause, "we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification."); *cf. Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ("a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect"). In order to find that there is no constitutional issue to decide, the Court would have to find that the statute makes no classifications, something it clearly does. Because the statute classifies benefits recipients into two groups for purposes of calculating benefits, those attending school in the Philippines and those attending school anywhere else in the world, the Court must address the appellant's claim that this classification scheme is unconstitutional.

Third, the concurrence's argument that the constitutional issue can be avoided is based upon the circular reasoning that the Court must reject her invitation to analyze the statute because the Court has analyzed the statute and found it does not treat her unfairly. The concurrence tries to find support for this tautology in a quotation from a district court opinion that repeats a congressional finding that the cost of living is lower in the Philippines. However, the very next sentence,

which the concurrence leaves out, continues: "Upon this record we hold that the differentiation made by Congress had a rational basis and, therefore, did not amount to a denial of Fourteenth Amendment equal protection or Fifth Amendment due process." *Filipino American Veterans and Dependents Ass'n. v. United States,* 391 F.Supp. 1314, 1323 (N.D.Cal.1974). Thus, it is clear that the language quoted by the concurrence was the district court's rationale in *deciding,* not avoiding, the constitutional issue.

Fourth, the concurrence's attempts to bolster with legislative history its argument that the statute is not treating the appellant unfairly are unpersuasive. The first item cited by the concurrence is the statement of a single senator concerning a different piece of legislation passed 24 years earlier, and the second, while actually concerning the legislation at issue, is not a finding by Congress but rather an observation made by the Administrator of Veterans' Affairs in an agency report on proposed legislation.

Finally, the concurrence cites to a Wall Street Journal article in an attempt to prove that the cost of the appellant's education is less than half the cost of a similar education in the United States. This overlooks the fact that the statute singles out students attending institutions in the Philippines for treatment different from that of students attending school *anywhere else in the world,* not just in the United States. In short, what the concurrence ends up doing, despite what is *says* it is doing, is to demonstrate that a rational basis exists for § 3532(d)'s classification system, a conclusion with which the Court agrees, albeit for a different reason. *See infra.*

■ The appellant's claim is one for denial of due process under the Fifth Amendment of the United States Constitution. "[Although] [t]he Fifth Amendment ... does not [specifically] contain an Equal Protection Clause as does the Fourteenth Amendment which applies only to the states[,] ... discrimination may be so unjustifiable as to be violative of due process." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). When determining whether there has been a violation of due process, the Su-

preme Court applies the same standard to the federal government that it applies to the states under the Equal Protection Clause of the Fourteenth Amendment. *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 2106–08, 132 L.Ed.2d 158 (1995) (including extensive review of relevant Supreme Court cases); *see also Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Robinson,* 9 Vet.App. at 401 (quoting *Bolling, supra* ); *Latham v. Brown,* 4 Vet.App. 265, 266 (1993).

■ When analyzing an equal protection claim, the Court "must first determine what burden of justification the classification created thereby must meet, by looking to the nature of the classification and the individual interests affected." *Giancaterino, supra* (quoting *Mem'l Hosp. v. Maricopa County,* 415 U.S. 250, 253, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974)). Unless a classification is suspect, such as where it is predicated on race or alienage, or where it involves a fundamental right, such as voting, it need meet only the rational basis test rather than any form of heightened scrutiny. *See Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *Robinson, supra; Latham,* 4 Vet.App. at 266–67. "Social and economic legislation ... that does not employ suspect classifications or impinge on fundamental rights ... carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (internal citations omitted).

■ Even if a suspect class is not mentioned in the text of the statute, a facially neutral statute will still be subject to strict scrutiny if motivated by discriminatory purpose. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("When there is proof that a discriminatory purpose has been a motivating factor[,] ... judicial deference is no longer justified."). "In determining whether such a purpose was a motivating factor, the ... disproportionate effect of official action provides an important starting point." *Crawford v. Bd. of Educ.,*

*etc.,* 458 U.S. 527, 544, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982) (internal citations omitted). However, the Supreme Court has consistently rejected the proposition "that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of [a protected group]." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *see Personnel Adm'r of Massachusetts,* 442 U.S. at 272, 99 S.Ct. 2282 ("even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose"); *Village of Arlington Heights,* 429 U.S. at 264–65, 97 S.Ct. 555 ("official action will not be held unconstitutional solely because it results in a ... disproportionate impact"). Nevertheless, "under some circumstances proof of discriminatory impact 'may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain otherwise.'" *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (quoting *Washington, supra* ).

■■■ Accordingly, a party challenging a law on equal protection grounds "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712 (citing *Washington,* 426 U.S. at 239–42, 96 S.Ct. 2040). The burden is on the proponent of the equal-protection claim to submit direct or circumstantial evidence of discriminatory intent, and "[t]he standard of judicial review is not altered because of appellant's unproved allegations of ... discrimination." *Jefferson v. Hackney,* 406 U.S. 535, 547, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *cf. Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712 ("'the burden is, of course,' on the defendant who alleges discriminatory selection of the venire to 'prove the existence of purposeful discrimination'") (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)).

This case is not suitable for summary disposition because the reasoning adopted in the Court's prior equal-protection cases does not apply to the facts of this case. *See Frankel v. Derwinski,* 1 Vet.App. 23, 25–26 (1990) (listing criteria for single-judge disposition). In *Florentino v. Brown,* the Court held that 38 U.S.C. § 107(a) (enacted by First Supplemental Surplus Appropriation Recision Act, Pub.L. No. 79–301, 60 Stat. 6, 14 (1946)), which provides for lower benefits to Filipino veterans of World War II, is not a violation of equal protection as applied to Filipino veterans who have since become U.S. citizens. 7 Vet.App. 369, 371 (1995). *Florentino* relied on the U.S. Court of Appeals for the Federal Circuit's holding in *Talon v. Brown,* which held that § 107(a) is not a violation of equal protection as applied to Filipino veterans generally. *See Talon,* 999 F.2d 514, 516–517 (Fed.Cir.), *cert. denied,* 510 U.S. 1028, 114 S.Ct. 643, 126 L.Ed.2d 601 (1993). *Talon,* in turn, relied heavily on the U.S. Court of Appeals for the District of Columbia Circuit's opinion in *Quiban v. Veterans Administration,* 928 F.2d 1154, 1159–61 (D.C.Cir.1991), which also held that § 107 did not represent an unconstitutional violation of equal protection. *Talon,* 999 F.2d at 516–17. In so holding, the *Quiban* court noted that, even though Filipino veterans are a "discrete and insular minority" (*see United States v. Carolene Prods. Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)) such as would normally be entitled to strict scrutiny of laws targeting them, because Congress was exercising its constitutional power "to make all needful Rules and Regulations respecting the Territory ... belonging to the United States," the fact that the veterans of the Filipino army during the Second World War (which occurred before the Philippines became independent of the United States in July 1946) are predominantly of one ethnicity does not trigger scrutiny more exacting than rational basis. *Quiban,* 928 .F.2d at 1159–61 (quoting U.S. CONST. Art. IV, § 3, cl. 2). Similarly, in *Dela Pena v. Derwinski* this Court expressly relied on the holding in *Quiban. Dela Pena,* 2 Vet. App. 80, 81 (1992).

Turning to the matter at hand, the Court notes that § 3532(d) was enacted in 1970,

long after the Philippines became independent of the United States (*see* Veterans Education and Training Amendments Act of 1970, Pub.L. No. 91–219, § 210, 84 Stat. 76, 83 (1970)), and that it does not appear that Filipino veterans or their dependants have ever been eligible for chapter 35 education benefits. *See, e.g.,* 38 U.S.C. § 107 (1970) (limiting Filipino veterans under title 38 to benefits under chapters 11, 13, and 23). Hence, it does not appear that 38 U.S.C. § 3532(d) was an exercise of Congress' power under the Territory Clause, but rather an exercise of Congress' power under Art. I, § 8, to "raise and support armies." *See Johnson,* 415 U.S. at 376, 94 S.Ct. 1160. Thus, the Court cannot rely on the Territory Clause and cases concerning that clause as the basis for determining whether rational-basis analysis applies to this claim.

■ Section 3532(d) is neutral on its face and applies equally to all persons eligible for chapter 35 benefits, regardless of race or ethnicity, that choose to attend educational institutions in the Philippines. To the extent that the appellant argues that the law should be subject to strict scrutiny because it discriminates against U.S. citizens of Filipino ancestry, the Court notes that the appellant has made no showing of a discriminatory intent on the part of Congress either through direct evidence or through evidence of a disparate impact on such citizens. *See Jefferson, Washington, Village of Arlington Heights, Batson, Crawford,* and *Personnel Adm'r of Massachusetts,* all *supra.* Moreover, to the extent that the appellant argues that the law denies educational institutions in the Philippines equal protection, that argument (assuming that the appellant would have standing to assert the rights of third parties, *see In Matter of the Fee Agreement of Stanley,* 9 Vet.App. 203, 210–14 (1996)), is without merit because, as foreign institutions located outside any area to which the laws of the United States extend, they are not subject to such laws, and, therefore, they cannot claim equal protection under them. *See* U.S. CONST. amend XIV, § 1 (state may not "deny to any person *within its jurisdiction* the equal protection of the laws" (emphasis added)); *Jacobsen v. Marin General Hosp.,* 963 F.Supp. 866, 870 (N.D.Cal.1997) (citing *Plyl-*

*er v. Doe,* 457 U.S. 202, 212, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)); *cf.* 38 U.S.C. § 107(a) (dealing with group of individuals resident in U.S. territory and subject to laws of the United States at time law was enacted). Finally, the Court observes that there is no recognized fundamental right to education, much less higher education. *See San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 37, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Because § 3532(d) is neutral on its face and because the appellant has shown no discriminatory intent or impact based on race or alienage, she is entitled to only rational-basis review of § 3532(d). *See Florentino,* 7 Vet.App. at 370 (quoting *Talon,* 999 F.2d at 517).

■ The Court will now address whether § 3532(d) is supported by a rational basis. Section 3532(d) was enacted (as § 1732(c) of title 38, U.S.Code) by the Veterans Education and Training Amendments Act of 1970, Pub.L. No. 91–219, § 210, 84 Stat. 76, 83 (1970). The specific provision that became § 3532(d) had its origin in a House bill, H.R. 6808. *See* H.R. Conf. Rep. No. 91–918, 20, n. 1 (1970) (Statement of the Managers on the Part of the House in conference report on H.R. 11959). The legislative history of this bill indicates that the provisions that became § 3532(d) were expected to produce savings of over eight million dollars in the first five years after their enactment. *See* H.R.Rep. No. 91–243, 8 (1969); *see also* S.Rep. No. 91–487, 68, 100 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2576, 2633. Financial concerns are, of course, one of the most common and accepted bases for legislation that affects government spending. *Cf. Harris v. Rosario,* 446 U.S. 651, 652, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (holding that financial concerns provide rational basis for Congress to exclude Puerto Rican residents from Social Security system (citing *Califano v. Torres,* 435 U.S. 1, 5, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978))). Therefore, a desire to reduce federal spending provides a rational basis for the enactment of § 3532(d).

For the reasons stated, the Court holds that § 3532(d) does not violate the equal

protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## III. CONCLUSION

Upon consideration of the above analysis, the Court holds that the appellant has not demonstrated that the BVA committed either factual or legal error that requires reversal or remand. *See* 38 U.S.C. § 5107, 7104(d), 7261. The April 4, 1997, BVA decision is AFFIRMED.

NEBEKER, Chief Judge, concurring:

While I concur in the result, I am convinced that the in-depth constitutional analysis relied upon by my colleagues is unnecessary and should be avoided. The appellant is arguing that she is being discriminated against because she chooses to attend a Philippine educational institution, i.e., that VA has denied her—a student in the Philippines—the same monetary benefit that other students—not in the Philippines—enjoy. My colleagues accepted the invitation of the parties in this appeal to treat the issue they present as one of disparate treatment. They then resolve that question by applying the rational basis level of scrutiny to the perceived unequal treatment and justify that disparity on the ground of conserving the public fisc. But, when one sees what the 50 cents on the dollar formula was designed to achieve, the opposite of disparity is found to be the case.

The 1946 legislation that permitted payment of VA benefits to Filipino veterans at a lesser rate acknowledged the significant difference in standards of living and monetary purchasing power. "Whenever any part of the GI bill of rights is extended to Filipino veterans, the cost of living in the Philippines and other economic factors must be given careful consideration." (Senator Hayden of Arizona; Hearings before the Subcommittee of the Committee on Appropriations, United States Senate, 79th Congress, 2d Session on H.R. 5604, March 25, 1946, at 60.) Indeed, when the legislation here in question was considered and enacted, "the peso formula," with respect to the payment of educational assistance benefits, was recognized as a source of offsetting the cost of a different section of the bill. S.Rep. No. 487, 91st Cong., 2nd Sess. __, (1970) *reprinted in,* 1970 U.S.C.C.A.N. 2576, 2633. In a facial constitutional challenge brought under the then-effective provision 28 U.S.C. § 2282, a three-judge federal District Court panel noted the original peso formula and its congressional origin:

As to the 50% [m]onetary limitation of allowed service-connected benefits for Filipino veterans, the Congressionally asserted reason for this differentiation was that standards of living and monetary purchasing power in the Philippines were wholly different from those in the United States—so much so that, if compensation for service-connected death or injury were paid to veterans in the Philippines in the same monetary currency as paid to veterans living in the United States, the Philippine veterans might be receiving more (in buying power) than the former.

*Filipino American Veterans and Dependents Association v. United States,* 391 F.Supp. 1314, 1323 (N.D.Cal.1974). That Court, as my colleagues observe, went on to decide the perceived constitutional issue which in my view, it need not, and should not, have done. Thus, as applied to the educational assistance statute, the formula for benefit payment recognizes the excessive real purchasing power of the dollar in the Philippines, and remedies the disparity so as not to overcompensate those attending Philippine educational institutions in relation to those attending school in the U.S. History teaches that the Japanese occupation of the Philippines, beginning in 1942, put the population of that then-U.S. territory in a unique position once the occupation ended. Many of the young Filipinos who served in our armed forces became entitled to veterans benefits, and thus special provisions of law were required to deal with this unique situation.

While Ms. Reeves complains that her right to "equal protection of the law" has been violated, in truth she—and others seeking to further their education in the Philippines—have simply been denied a windfall, which, if granted, would work a real discrimination against those receiving educational benefits

in the United States. Recourse to the October 2, 1995, edition of The Wall Street Journal discloses that, at the time of her first semester at the Far East University, the exchange rate was roughly 25.4 pesos for one U.S. dollar. The record reveals that Ms. Reeves' entire first semester tuition and fees for the fall of 1995 cost 7,160 pesos. R. at 31. Given those figures, it is apparent that with just two months' $202.00 educational assistance payment from VA, an entire semester at the Far East University could be paid for, with over 3,000 pesos left over. Certainly, the same cannot be said of two $404.00 payments received by a student in the United States, at any higher-education institution. Ms. Reeves is not a victim of discrimination, and therefore, in my view, the Court need not, and ought not, engage in a drawn-out constitutional analysis beyond such a determination.